```
 1                    UNITED STATES DISTRICT COURT
                         DISTRICT OF MINNESOTA
 2

 3      ------------------------------------------------------------
                                     )
        United States of America,    )   File No. 18cr150(3),
 4                                   )   18cr291, 18cr20014
                 Plaintiff,          )          (DWF/HB)
 5                                   )
        vs.                          )
 6                                   )   St. Paul, Minnesota
        Joe Morris,                  )   January 24, 2019
 7                                   )   9:33 a.m.
                 Defendant.          )
 8      ------------------------------------------------------------

 9             BEFORE THE HONORABLE DONOVAN W. FRANK
10              UNITED STATES DISTRICT COURT JUDGE
                        (CHANGE OF PLEAS)
11
        APPEARANCES
12       For the Plaintiff:        United States Attorney's Office
                                   John Docherty, AUSA
13                                 Julie Allyn, AUSA
                                   300 South 4th Street
14                                 Suite 600
                                   Minneapolis, Minnesota 55415
15
         For the Defendant:        Robert Richman, Esq,
16                                 PO Box 16643
                                   St. Louis Park, MN 55416
17
         Court Reporter:           Lynne M. Krenz, RMR, CRR, CRC
18                                 Suite 146
                                   316 North Robert Street
19                                 St. Paul, Minnesota 55101

20

21

22

23           Proceedings recorded by mechanical stenography;
        transcript produced by computer.
24

25
```

1      **P R O C E E D I N G S**

2                    **IN OPEN COURT**

3        (Defendant present)

4            THE COURT:  The Court will call United States

5      versus Morris.

6              Before we continue, why don't we have

7      instructions by Counsel, we can start on my right, Counsel's

8      left.

9            MS. ALLYN:  Good afternoon -- no morning, Your

10     Honor.

11           THE COURT:  Still morning.  Still morning there.

12           MS. ALLYN:  Julie Allyn and John Docherty for the

13     Government.

14           MR. RICHMAN:  Robert Richman for the Defendant,

15     who's also present beside me, Your Honor.

16           THE COURT:  Mr. Morris, my name is first name

17     Donovan, last name Frank.  I'm the assigned Federal Judge on

18     your case.

19             In a few moments, you and I will be going through

20     a Plea Agreement, sentencing stipulations.  I'll also be

21     going through with you your constitutional rights, and it's

22     only after we've done each of those things, that I'll

23     formally take your pleas in this case.  And maybe before we

24     go any further, we can have Counsel and the Defendant come

25     to the podium, please.

1          The first thing I'm going to do is have Ms.

2     Sampson give you the oath that every defendant and every

3     witness takes in a case.

4          MS. SAMPSON:  Please raise your right hand.

5          (Defendant sworn.)

6          THE DEFENDANT:  Yes.

7          THE COURT:  You may lower your hand, sir.  If you

8     would state your full name for the record.

9          THE DEFENDANT:  Joe Morris.

10         THE COURT:  And your date of birth?

11         THE DEFENDANT:  5/29/95.

12         THE COURT:  You appear in court with your

13    attorney,Mr. Richman this morning.  Have you had enough time

14    to discuss this case with your lawyer?

15         THE DEFENDANT:  Yes.

16         THE COURT:  Are you satisfied so far in the case

17    with his services and representation?

18         THE DEFENDANT:  Yes.

19         THE COURT:  I'll now ask you a question I ask

20    every defendant.  And I usually explain it that way so you

21    don't think, well, why does the Judge ask me if I'm high or

22    under the influence?  I don't suspect anything.  But I want

23    to make certain that there's nothing happening today that

24    will get in the way of you making decisions in a knowing and

25    voluntary way, as we call it, with the help of your lawyer.

1          So today at this time, are you under the influence

2     of any alcohol or drugs?

3          THE DEFENDANT:  No.

4          THE COURT:  Now, sometimes, unrelated to Court,

5     any of us could be taking over-the-counter medication,

6     medication given or prescribed by a doctor.  And it can

7     temporarily or otherwise kind of confuse somebody, make it

8     difficult to concentrate.

9          Is there anything that you're taking that would

10    get in your way of understanding everything today?

11         THE DEFENDANT:  No.

12         THE COURT:  Do we have a signed plea agreement?

13         MS. ALLYN:  Yes, Your Honor.  If I may, before I

14    approach the bench, Mr. Morris will --

15         THE COURT:  Okay.

16         MS. ALLYN:  -- close to seeing it, is that your

17    signature?

18         THE DEFENDANT:  Yes.

19         MS. ALLYN:  Your Honor, may I tender the --

20         THE COURT:  You may.

21         MS. ALLYN:  Thank you.

22         THE COURT:  Now, this is a question I'll -- as the

23    lawyers know, I asked in every case.

24         Any changes on this agreement compared to the

25    unsigned agreement I received right before the hearing?

1            MS. ALLYN:  No, Your Honor.

2            MR. RICHMAN:  I assume not, Your Honor.

3            THE COURT:  Okay.  And the reason I ask that in

4     every case, and the lawyers are aware of it, sometimes

5     defendants are, Mr. Morris, but not always, sometimes there

6     are changes in the Plea Agreement, but let me explain to you

7     what I do in every case.

8            To the credit of the U.S. Attorney's Office and

9     criminal defense lawyers in Minnesota, because the practice

10    doesn't vary by judge or by case in Minnesota, but the

11    practice varies quite a bit between federal court to federal

12    court across the country, and state and federal court.

13           But to the credit of the U.S. Attorney's Office

14    and criminal defense lawyers here in Minnesota, when they

15    believe they have an agreement, even though it's not binding

16    on anybody until we come to court, it's signed off, then we

17    go through the whole thing out in the open, it's -- the --

18    when they believe they have the agreement, even though it's

19    not binding, they send it to the assigned judge for two very

20    important reasons.

21           One, they have a right to expect, as you do, that

22    I would have read it before I came through the door, and I

23    did.

24           And two, they have a right to expect, as you do,

25    that if I didn't understand something, or maybe frankly

1   speaking, I was bothered by something.  Or I wanted to make

2   certain I understood what was intended by any provision, I

3   wouldn't sit here quiet and then just for the first time

4   bring it up at sentencing.

5           And so, and so it has the -- the effect of

6   reducing surprises at the time of sentencing.  And most

7   people don't like last-minute things coming up for the first

8   time, so.

9           And sometimes there are changes, anything from

10  typographical to other errors, to other kind of changes so

11  that's why I ask that question of the attorneys.

12          Now I'm up here a ways.  Is that your signature on

13  the back page?

14          THE DEFENDANT:  Yes.

15          THE COURT:  Anybody force you or threaten you to

16  sign this?

17          THE DEFENDANT:  No.

18          THE COURT:  Now you and I are going to go over

19  this agreement.

20          And my name is not on the bottom of it.  And

21  that's true for all Plea Agreements, because I wasn't a

22  party to the agreement, but the best way I can explain it,

23  is that it comes to me in the form of a recommendation, by

24  you, your attorney, the Government's Counsel.

25          And so you and I are going to go through this.

1    And every step of the way you can ask me questions.  As the

2    lawyers know, every step of the way, as I mentioned, whether

3    you want to stop and talk privately to Mr. Richman, or he

4    wants you to stop, you have that right as well.

5              Because it's only after we've been through the

6    agreement and the -- and your constitutional rights that

7    I'll formally ask you to enter pleas in the case.

8              So I'm not asking you to plead guilty just yet.

9    But under -- under this agreement, the -- do you understand

10   your -- and I'll go through these with you now.  There are

11   five offenses you're agreeing to plead guilty to.

12             Count 1 -- and I'll talk about the three charges

13   in Illinois.

14             Count 1 is in the indictment from Illinois is

15   possession between in or around October of 2017 to on or

16   about February 27th of 2018.  In the Central District of

17   Illinois of a machine gun, in violation of a federal law.

18             Do you understand that that's one of the charges?

19             THE DEFENDANT:  Yes.

20             THE COURT:  Then Count 2 of that indictment is

21   conspiracy to interfere with commerce by threats and

22   violence from on or about August of 2017 to at least

23   March 10th of 2018, in Ford County in the Central District

24   of Illinois, and elsewhere.  Do you understand that's

25   Count 2?

1          THE DEFENDANT:  Yes.

2          THE COURT:  And then Count 3 is attempted arson,

3     on or about November 7th of 2017, in Champaign County,

4     excuse me, in the Central District of Illinois.  Do you

5     understand that?

6          THE DEFENDANT:  Yes.

7          THE COURT:  Now moving on to the two counts in the

8     Minnesota indictment that are part of the agreement.

9     Count 2 is intentionally obstructing and attempting to

10    obstruct by force, and the threat of force, and by means of

11    fire and explosives, the free exercise of religious beliefs

12    on or about August 5th, 2017, here in the State of or the

13    District of Minnesota.  Do you understand that?

14         THE DEFENDANT:  Yes.

15         THE COURT:  And then Count 4 is carrying and using

16    a destructive device during and in relation to a crime of a

17    violence on or about August 5th, 2017.  Do you understand

18    that?

19         THE DEFENDANT:  Yes.

20         THE COURT:  And that at the time of sentencing the

21    Government has agreed to move to dismiss the remaining

22    counts of the Minnesota indictment.

23         Now, I'm not -- I'm going to follow this in the

24    order it's written with a couple of exceptions I follow in

25    every case.  I'll come back to the factual basis after

1    you've entered your pleas of guilty.

2              So now I'm going to move over -- for the record,

3    I'm going to move over to Page 9, Paragraph 2 called, Venue.

4              It states here that you are agreeing that the case

5    can -- can be placed here in Minnesota.  Venue's kind of a

6    fancy word for that, a legal phrase for that.

7              And that you acknowledge that the Counts 2 and 4

8    of the Minnesota indictment were committed here in the

9    District of Minnesota.  And that, therefore, venue or this

10   is a proper place for the action.

11             And that you also acknowledge, admit, that

12   Counts 1, 2 and 3 of the Illinois indictment have been

13   transferred from Central Illinois to the District of

14   Minnesota for guilty pleas and for sentencing.  Which means

15   I'll be the sentencing judge on all five counts.

16             And pursuant to the Rules of Criminal Procedure

17   Rule 20, which allows for this.  And so that you agree with

18   the transfer here.  And actually, in part, was done at your

19   request.  Do you agree with all this?

20             THE DEFENDANT:  Yes.

21             THE COURT:  All right.

22             And I can -- I can indicate to you that it's very

23   consistent with the rules to -- in fact, it's -- I think

24   it's to the credit to the lawyers on both sides that there

25   must have been some communication that I wouldn't be a party

1    of, so they can kind of bring everything together in one

2    place, so.

3            And then it also states that since you've agreed

4    to this, so you do waive and give up any objections you may

5    have as to the transfer of those three crimes here to

6    Minnesota.  Do you understand that?

7            THE DEFENDANT:  Yes.

8            THE COURT:  Now, I'll come back to waiver of

9    pretrial motions when I go over your constitutional rights

10   with you.

11           I'll move on to Paragraph 4, excuse me.  Another

12   phrase I could use to -- to describe statutory maximum

13   minimums and what are those penalties that the United States

14   Congress sets, prison sentences as maximum and minimum?

15           So here it says that the parties agree that

16   Counts 1, 2 and 3 of the Illinois indictment -- and there's

17   classification of felonies under federal law.  And these are

18   what are called Class C felonies.  And that they -- I'm now

19   going to go through you, their penalties.

20           I'll start with Count 1 and that's the possession

21   of a machine gun in Illinois.

22           It says here you understand the maximum term of

23   imprisonment is not more than ten years.  Do you understand

24   that?

25           THE DEFENDANT:  Yes.

1           THE COURT:  Then there's a maximum supervised

2    release term of not more than three years.  Do you

3    understand that?

4           THE DEFENDANT:  Yes.

5           THE COURT:  Then there's a fine of up to $250,000.

6    Do you understand that?

7           THE DEFENDANT:  Yes.

8           THE COURT:  And then -- I'll describe just once,

9    because it's going to be in each of the counts.  And it's

10   true for every federal felony in America.

11          There must be a mandatory special assessment for

12   $100.  Because it's the one assessment that can't be waived

13   or suspended by the lawyers or the judge, because it goes

14   into a general fund for each federal felony for victims of

15   crimes.  Do you understand that?

16          THE DEFENDANT:  Yes.

17          THE COURT:  Count 2, Conspiracy to Interfere With

18   Commerce By Threats and Violence.  The maximum term of

19   imprisonment is not more than 20 years.  Supervised release

20   term of not more than three years.  And sometimes people use

21   the word probation for supervised release, that period of

22   time when you're living in the community having served any

23   prison sentence.

24          And the same fine of up to $250,000.  And $100

25   special assessment.  Do you understand that?

1          THE DEFENDANT:  Yes.

2          THE COURT:  Now Count 3, the -- and we'll talk

3     more about this also in the Minnesota -- one of the --

4     Count 4 in Minnesota case.

5          Count 3 of the Illinois indictment, attempted

6     arson.  There are some -- a number of federal felonies where

7     Congress comes in -- separate from what are called the

8     advisory guidelines and says, not just here are the maximum,

9     but here's the minimum -- minimum prison sentence.

10         So here there's a mandatory minimum term of

11    imprisonment of not less than five years.  Do you understand

12    that?

13         THE DEFENDANT:  Yes.

14         THE COURT:  There's a maximum term of imprisonment

15    of not more than 20 years.  Do you understand that?

16         THE DEFENDANT:  Yes.

17         THE COURT:  Supervised release term of not more

18    than three years.  And then that same fine of $250,000 and

19    $100 special assessment.  Do you understand that?

20         THE DEFENDANT:  Yes.

21         THE COURT:  Then moving on to the two counts here

22    in the Minnesota indictment.

23         I'll start with the Count 2 of the Minnesota

24    indictment, obstructing the free exercise of religion.

25         The maximum term of imprisonment is not more than

1      -- not more than 20 years.  Do you understand that?

2                  THE DEFENDANT:  Yes.

3                  THE COURT:  Then there's a supervised release term

4      of not more than three years.  Do you understand that?

5                  THE DEFENDANT:  Yes.

6                  THE COURT:   Then there's a -- the fine of

7      $250,000 and $100 special assessment.

8                  Then we move on to the using a destructive device

9      during the commission of a crime of violence.

10                 Here there's a mandatory minimum of not less than

11     30 years.  Do you understand that?

12                 THE DEFENDANT:  Yes.

13                 THE COURT:  Then the maximum is up to life in

14     prison.  Do you understand that?

15                 THE DEFENDANT:  Yes.

16                 THE COURT:  Then there's a fine -- same fine

17     provisions, $250,000.  $100 special assessment.

18                 And then the supervised release term of not more

19     than five years.  Do you understand that?

20                 THE DEFENDANT:  Yes.

21                 THE COURT:  Now, the -- just so we're clear, the

22     maximum punishment which could be imposed upon you by the

23     Court, I -- I would have the potential to sentence you to

24     the maximum term of imprisonment on each count and order

25     that those sentences be run consecutively, or on top of each

1    other as opposed to all together.  Which could be

2    potentially imprisonment for life and fines totalling

3    $1,250,000.  Do you understand that?

4            THE DEFENDANT:  Yes.

5            THE COURT:  Excuse me.

6            Now there's a Paragraph 5, revocation of

7    supervised release that simply but importantly means, if you

8    had served your prison sentence, whatever it was, and you

9    were living in the community, whether it was here or

10   elsewhere, Illinois, somewhere else, and would violate the

11   terms of your supervision, one of my options would be to

12   return you to prison.  Do you understand that?

13           THE DEFENDANT:  Yes.

14           THE COURT:  And we'll talk specifically about that

15   at the time of sentencing because the -- we have

16   responsibilities -- we -- to screen for all mental health,

17   all alcohol, and drug issues and a variety of many other

18   things.  It isn't as simple as saying, well, as long as you

19   don't commit a new crime, you're okay.

20           Because we have certain responsibilities.  But

21   because as your lawyer well knows, we'll discuss all those

22   things at the time of sentencing.

23           And the fact of the matter is, before we come back

24   for sentencing, each attorney not only sees a copy of the

25   presentence investigation report, which we'll talk about at

1   the end of this hearing, but they have the opportunity,

2   which they always take both -- both parties to submit what

3   are called written memorandums to the Court, talking about

4   what they believe is a fair sentence.  Do you understand

5   that?

6                 THE DEFENDANT:  Yes.

7                 THE COURT:  Now, we're going to go to Paragraph 6.

8   And it's going to -- that starts at the bottom of Page 12,

9   goes to Page 13, goes to Page 14, over to 15, 16.  And ends

10  at the top of 17.

11                Your attorney went through what are called the

12  sentencing guidelines in a book like this.  This might not

13  be the exact one, because they change the color every year.

14  This new color this year is red.  I don't know why they

15  change it every year, but they do.

16                And so the best way I can explain that is a group

17  of individuals got together authorized by Congress.  And

18  they were directed to rate and rank every federal felony on

19  how serious it is, and give it a seriousness rating or

20  ranking number, give it a name.  And then to establish rules

21  on, well, depending on what the crime is, increase or

22  decrease the seriousness ranking or rating of that.

23                So, your attorney and Government's Counsel,

24  they've taken the time to go over how the guidelines, they

25  believe apply to you with the information they have today.

1          And I say to their credit, because as I said in

2    the last hearing, and I actually say at a number of

3    hearings, I've worked at some districts, I'm here most of

4    the time, but sometimes assist to hear cases in other parts

5    of the country, where sometimes they don't discuss the

6    guidelines.  And they just say, here's the maximums, the

7    minimums, we'll wait to see what probation comes up.

8          And so I think gets everything more transparent

9    and everything's out in the open when they've taken the time

10   to go through these guidelines so they can tell you, tell

11   me, anybody else who's affected or interested in the case,

12   well, what does all this mean?  What are the potential

13   sentences suggested or recommended to the judge?

14         So you and I are going to go through that now, as

15   the lawyers have it here in your agreement.

16         On the top of Page 13, the phrase that's used as a

17   starting point for every federal felony guidelines is base

18   offense level.

19         So here it says, The base offense level for

20   Count 1 is 18 because the offense involved a firearm.  Do

21   you understand that?

22            THE DEFENDANT:  Yes.

23            THE COURT:  And 18 does not mean 18 years or

24   months, it's that seriousness rating.

25            Then it says, this offense is increased by four

1    levels because the machine gun was possessed in connection

2    with the commission of another felony, namely an armed

3    robbery in Ambia, Illinois.  Do you understand that?

4              THE DEFENDANT:  Yes.

5              THE COURT:  And that -- these, again, these are

6    rules here in the guidelines that the Court would expect the

7    Counsel to address as they have.

8              Then it says, The offense level is increased by a

9    further two levels because the Defendants possessed at least

10   three firearms.  Do you understand that?

11             THE DEFENDANT:  Yes.

12             THE COURT:  And that's another rule in the

13   guidelines.

14             Then it says, The adjusted offense level then for

15   Count 1, in the Illinois indictment is 18, plus 4, plus 2

16   equals 24.

17             Then it says the base offense level for Count 2 is

18   calculated by looking at the overall conspiracy into four

19   separate conspiracies to commit each of the three armed

20   robberies and one what's called extortionist act, for which

21   the overall conspiracy was carried out.

22             So we have the Ambia armed robbery.  So, there it

23   says the base offense level is 20.  And five levels are

24   added because a firearm was possessed.  Two levels are added

25   because the victims were physically restrained.

1          And the adjusted level, therefore, for that is 20

2    plus 5, plus 2, or 27.  Do you understand that?

3          THE DEFENDANT:  Yes.

4          THE COURT:  The Mount Vernon Wal-mart armed

5    robbery, similarly, we begin at 20.  There were no other

6    adjustments, so that stays at 20.  Do you understand that?

7          THE DEFENDANT:  Yes.

8          THE COURT:  For that armed robbery?

9          THE DEFENDANT:  Yes.

10         THE COURT:  Now as I say in a number of cases, and

11   I'll observe it here, maybe it's not important to you or

12   others when they see, well, there's no adjustments to the

13   base offense level.

14         Well, it's important to the Court, because it

15   means that your attorney, and Government's Counsel have

16   taken the time to look at everything.  And with what they

17   have today, they don't know of any other adjustments to add

18   or subtract from that starting point of 20.

19         Moving on to the Watseka Wal-mart armed robbery.

20   The base offense level again was 20.  Three levels were

21   added because of the dangerous weapon even under the rules,

22   the fake guns, and the rules in the guidelines.  And so that

23   makes an adjusted offense level for that Walmart armed

24   robbery of 23 or 20 plus 3.  Do you understand that?

25         THE DEFENDANT:  Yes.

1          THE COURT:  Then the attempted extortion from the

2    Canadian National Railway.  The base offense level is 18.

3    Two levels were added because the amount of money demanded

4    was more than $95,000, but less than $500,000.  And then

5    that becomes an adjusted level of 20, 18 plus 2.  Do you

6    understand that?

7          THE DEFENDANT:  Yes.

8          THE COURT:  Now moving on, the base offense level

9    for Count 3 of the indictment is 24, because the Women's

10   Health Practice was a place of public use.  Do you

11   understand that.

12         THE DEFENDANT:  Yes.

13         THE COURT:  And then it says that that level for

14   Count 2 is 24, both because of the bombing of the Dar

15   al-Farooq Islamic Center created a substantial risk of death

16   or serious bodily harm to a person, other than a participant

17   in the offense.  And because the Islamic Center was a place

18   of public use.

19         In other words, there's definitions for these

20   entities, and institutions in the guidelines.  Do you

21   understand that?

22         THE DEFENDANT:  Yes.

23         THE COURT:  So to this, three levels are added

24   because the bombing of the Islamic Center was a hate crime.

25         And then the Islamic Center was chosen for bombing

1  because of it was a Muslim house of worship.  Do you admit

2  and agree to that?

3           THE DEFENDANT:  Yes.

4           THE COURT:  And then the adjusted offense level

5  for Count 2 of the Minnesota indictment becomes then 27.

6           And there is no guideline based offense level for

7  Count 4 of the Minnesota indictment.  And there's a --

8  that's not just unique to this offense.

9           But the reason for that is there's a statutory

10  mandatory minimum.

11           If you remember, I said Congress sets minimums for

12  a number of offenses.  Here they've set sentence of

13  imprisonment for not less than 30 years.  Do you understand

14  that?

15           THE DEFENDANT:  Yes.

16           THE COURT:  And then the -- and so the -- I'm

17  going to right now go through this phrase called, Grouping

18  of counts of the conviction.

19           The guidelines comes up with the way to say, Well,

20  there has to be rules that we -- we just don't pick one

21  offense and just get one sentence no matter how many crimes

22  there are, and that's usually called imposing everything

23  concurrently.

24           Or the other extreme, is let's just add them all

25  up and make everything consecutive.

1          And so the grouping is a concept here, in the

2     guidelines that your attorney and the Government's lawyers

3     have taken the time to go through.

4          So here they've gone through all of that and, as a

5     grouping, because it's sometimes more complicated than it

6     sounds.

7          Because the primary victim of Count 1 of the

8     Illinois indictment is society at large.  Do you understand

9     that?

10          THE DEFENDANT:  Yes.

11          THE COURT:  And then the primary victims of

12     Count 2 are the Canadian Railway, which was the victim of

13     the extortionist, or threatening act by which the conspiracy

14     interfered with commerce was carried out.

15          And then the victims of the various armed

16     robberies in Ambia, Indiana, and Mount Vernon Wal-mart, and

17     Watseka Wal-mart with respect to the conspiracy to interfere

18     commerce was carried out.

19          The primary victim of Count 3 of the Illinois

20     indictment is the Women's Health Practice.

21          And the primary victim of Counts 2 and 4 of the

22     Minnesota indictment is the Islamic Center and its

23     congregants, because of none of the Counts to which you are

24     pleading guilty have a primary victim in common.  Although

25     those counts are not grouped together.  Do you understand

 1   that?

 2                  THE DEFENDANT:  Yes.

 3                  THE COURT:  Now Count 1 of the Illinois indictment

 4   groups the Ambia armed robbery, because the robbery

 5   guidelines contains an increase for possession, use,

 6   brandishing of a firearm.  While the firearm guidelines

 7   contain what's called an enhancement for use of a firearm,

 8   and commission of another felony offense.

 9                  And then Count 4 the Minnesota indictment does not

10   group with any other count.  And that's because the sentence

11   for Count 4 of the Minnesota indictment is consecutive to

12   the sentence calculated for the remaining counts.

13                  Excuse me, I don't have a cold, so if you're

14   thinking, Is the judge spreading germs to everybody?  No.

15                  The overall sentence for the counts other than

16   that Count 4, they are determined in using grouping rules,

17   which we'll discuss in the guidelines.  Because Count 4 has

18   a mandatory minimum and is consecutive.  Do you understand

19   that?

20                  THE DEFENDANT:  Yes.

21                  THE COURT:  Now moving on to then the guidelines.

22                  The -- the advisory guidelines as this Plea

23   Agreement very clearly spells out, they go to the

24   determining the sentence for the most serious count in the

25   conviction.  And then the lawyers have looked at the rules.

1    And so the most serious offense, under the guidelines, is

2    the starting point.

3            And so then they also have to identify the most

4    serious offense, well, here, other than Count 4, which isn't

5    controlled by the guidelines, are the Ambia armed robbery,

6    and the obstruction of the free exercise of religious

7    beliefs, both of which have an adjusted level of 27.

8            And the obstruction of the free exercise of

9    religious beliefs is the most serious offense for purposes

10   of the guideline calculation.  Do you understand that?

11           THE DEFENDANT:  Yes.

12           THE COURT:  Now to the offense Level 27 for the

13   Islamic Center bombing, four levels are added.  Because

14   under the guideline grouping rules.  One unit is assigned

15   for the bombing itself.  To which is added one unit for the

16   Ambia armed robbery.  One unit for the attempted arson of

17   the Women's Health Practice.  One unit for the Watseka armed

18   robbery.  One half unit for the Mount Vernon armed robbery.

19   And one half unit for the Effingham attempted extortion.

20   Which makes it a total of five units, which corresponds to

21   what we call a four-level increase to this phrase of

22   Adjusted Offense Level.

23           So where that takes us is, other than Count 4 of

24   the Minnesota indictment, that creates an adjusted level of

25   31.  Do you understand that?

1          THE DEFENDANT:  Yes.

2          THE COURT:  And as I've said before, that number

3    doesn't mean 31 years or 31 months, but it's that

4    seriousness rating.

5          And, then, again, on subparagraph f, at the top of

6    16 where it says, No Other Chapter 3 Adjustments, the -- it

7    may seem that that word isn't -- that phrase isn't

8    important, but I'll repeat something.  It tells me that the

9    lawyers have taken the time to look carefully at the rules.

10         And other than what's called Acceptance of

11   Responsibility, which we'll talk about now, they don't know

12   of any other adjustments in the chapter.

13         Acceptance of responsibility means this:

14         If you plead guilty in a few minutes, testify

15   truthfully during your plea, cooperate with filling out the

16   Presentence Investigation Report.  Testify truthfully also

17   at your sentencing hearing.  And don't do anything

18   inconsistent with accepting responsibility and pleading

19   guilty, the Government, under the guidelines, will recommend

20   the three-level reduction for entering this -- these pleas

21   in a timely manner.  Do you understand that?

22         THE DEFENDANT:  Yes.

23         THE COURT:  Two quick examples of sometimes a

24   defendant asks me, not very often, well, how are we supposed

25   to know what committing some act inconsistent with

1    acceptance of responsibility would be?

2            Well, I'll first be clearer to you, it rarely

3    happens, because for that to happen a lawyer -- a defendant

4    has to ignore the advice of their attorney, and most don't.

5            But I'll give you two real-life examples that

6    happened here in the courtroom over a few years ago.

7            Someone that was standing where you're standing,

8    in custody, they pled guilty to distribution of

9    methamphetamine.

10           And most defendants know that county jail, state

11   prisons, federal prisons, all phone calls are taped.  But

12   not to -- unless you're talking to your lawyer.

13           Well, apparently, this defendant on the way back

14   to the Sherburne County Jail had forgot he had a large

15   suitcase of meth hidden in a storage locker, nobody knew

16   about.

17           So he assumed the phone call would be taped, so he

18   tried to talk in a secret code to his girlfriend.  The code

19   didn't work because law enforcement ended up with the meth

20   and he lost his Plea Agreement.

21           Somebody standing where you're standing who wasn't

22   in custody, pled guilty to telemarketing fraud, then drove

23   over to Hudson, Wisconsin, opened up the same business.

24           So he not only after the plea lost his Plea

25   Agreement, but I was obligated to issue a warrant and he was

1    taken into custody.

2            I emphasize it rarely happens.  But those would be

3    examples of some type of conduct inconsistent with

4    acceptance.  Do you understand that?

5            THE DEFENDANT:  Yes.

6            THE COURT:  Now, the adjusted level before

7    acceptance is 31.

8            So that means that with the three-level guideline

9    reduction for acceptance of responsibility, that creates

10   what we call an adjusted level of 28.  Do you understand

11   that?

12           THE DEFENDANT:  Yes.

13           THE COURT:  Now, under criminal history, on the

14   one hand, this is not a stipulation.  And speaking in plain

15   language, that means that you keep the right with the help

16   of your lawyer, as does the U.S. Attorney's Office to see

17   what probation comes up with your criminal history -- excuse

18   me, since they have, you know, they're able to look at more

19   information.

20           However, the lawyers know that in order to best

21   evaluate what the guidelines sentence is, it's suggested or

22   advised, so they can tell you, tell me, tell any interested

23   public member or affected member, or anyone, they do their

24   best to make an evaluation of what they believe it to be,

25   because it can have an affect, sometimes small, sometimes

1   not significant on the sentence.

2           So with the information they have, they believe

3   that your Criminal History Category is -- is I, which to the

4   extent it's relevant, is the lowest level.  There's I

5   through VI.  But they believe it's I.  Do you understand

6   that?

7           THE DEFENDANT:  Yes.

8           THE COURT:  Now if you're at this level on

9   everything that the -- what we'll talk about, the Count 4,

10  which isn't subject to the guidelines in the Minnesota case,

11  if the offense level is at that adjusted level of 28 and you

12  aren't at that Criminal History Category of I, the

13  imprisonment -- the advisory imprisonment range on all but

14  that count would be 78 to 97 months.  Do you understand

15  that?

16          THE DEFENDANT:  Yes.

17          THE COURT:  Now moving on to the next phrase,

18  Total Guideline Sentence of Imprisonment.

19          It says the total advisory sentence of

20  imprisonment is the guideline range set forth we just talked

21  about in j, plus to 360 months, or that 30-year mandatory

22  minimum, for Count 4.

23          And then it says because the 30-year mandatory

24  minimum on Count 4 may not be concurrent with any other term

25  of imprisonment, the five-year mandatory minimum for Count 3

1    of the Illinois indictment must be added to the 30 years,

2    Count 4.

3              In all respects, however, Count 3 of the Illinois

4    indictment, they're grouped together.

5              So that means that the total guideline

6    imprisonment range, and its advisory range of 438 to

7    457 months.  And it's a total mandatory minimum set by

8    United States Congress is 30 plus 5, years, or 35 years, or

9    420 months.  Do you understand that?

10             THE DEFENDANT:  Yes.

11             THE COURT:  Now moving on -- the, the if we -- at

12   that Level 28, we're at a fine range of $25,000 to $250,000.

13             And the guideline supervised release term is at

14   least two years, not more than five years on the -- what's

15   called the Class A felony, the most serious, and on the

16   Class C felonies, of at least one year, but not more than

17   three.  Do you understand that?

18             THE DEFENDANT:  Yes.

19             THE COURT:  Now, something that I try to suggest

20   in every case.  And I actually, now that I'm thinking about

21   it, through nobody's fault but my own, I didn't earlier this

22   morning.

23             One thing about Plea Agreement, and sometimes they

24   were -- it's misunderstood by the public, not by the lawyers

25   or anybody here.  When the sentencing is done, you know,

1    your lawyer has the right to argue whatever sentence you

2    think is fair.  The Government has a right to do that, what

3    is fair.

4           You can both argue fully what you think the right

5    and fair sentence is.

6           But whether you and your lawyer are thinking, ah,

7    the judge gave me -- he could have, should have given me

8    less time.  I think he gave me -- wasn't fair with me.

9           Or maybe the Government's thinking the opposite.

10   Well, the judge should have given more.

11          Both of you can argue fully what you think the

12   fair and right thing is to do.  But neither side can back

13   out of the Plea Agreement.

14          Do you understand that?

15          THE DEFENDANT:  Yes.

16          THE COURT:  Because once a judge accepts a Plea

17   Agreement, it's very difficult for either party.  Because

18   the law of values finality is very difficult to back out of

19   a Plea Agreement, so that's why I try to bring that up.

20          Moving on to restitution.  And I believe that

21   those issues, Counsel, are being evaluated.  And whether

22   there's an agreement or not, the issue will be addressed to

23   the Court at the time of sentencing?

24          MS. ALLYN:  That's correct, Your Honor.

25          MR. RICHMAN:  Yes, Your Honor.

1          THE COURT:  And that means to you, Mr. Morris,

2     that sometimes there's an agreement on what the restitution

3     is.

4          But whether there is or this isn't, it's my

5     responsibility to evaluate, to hear everybody out at the

6     time of sentencing and then make that decision.

7          And then, in some cases, I'm not saying it will

8     happen in this case, because usually we know on the eve of

9     sentencing, we just don't find out on the date of

10    sentencing, we find out, well, the parties need another

11    30 days or 60 days to get more information.

12         We don't continue the sentencing.  But if either

13    party says, can we submit a bit more information in

14    restitution?  But we set that all up at the sentencing

15    hearing so everybody knows, because everything's out in the

16    open.

17         So you'll know what that is at the time of

18    sentencing.  Do you understand that?

19         THE DEFENDANT:  Yes.

20         THE COURT:  Now there's a phrase, Waiver of Appeal

21    of Attack.

22         It states here that you understand that under the

23    law, that as part of this agreement, you are agreeing to --

24    and I'll give a couple of the things that we discussed in

25    the other case, too.

1            You recognize that under this case, number one, on

2     the one hand, you're waiving your right to appeal the -- the

3     sentence in the case, even though you understand that you

4     can appeal if the Government does not make or the Court does

5     not grant certain motions.  Do you understand that?

6            THE DEFENDANT:  Yes.

7            THE COURT:  But as we talked about in the last

8     case, not unique to these, because the parties acknowledge,

9     including the United States, that the sentencing guideline

10    calculations, frankly speaking are complicated.

11            The United States has agreed not to seek to

12    enforce this appeal waiver of this sentence to the limited

13    extent that your grounds for appeal are on an alleged

14    miscalculation of the sentencing guidelines by the Court,

15    which means me.  Do you understand that?

16            THE DEFENDANT:  Yes.

17            THE COURT:  And so we got that right out in the

18    open, unless either Counsel want to say anything more about

19    that, I'll move on.

20            MS. ALLYN:  Nothing further from the Government,

21    Your Honor.

22            THE COURT:  Mr. Richman?

23            MR. RICHMAN:  We're content.

24            THE COURT:  Paragraph 11 under the forfeiture.

25            I'll go onto the top of Page of 19 and

1    subparagraphs 8 through a through i.

2                    I just want to make sure you understand that there

3    are four rifles and four shotguns, and ammunition related to

4    each that you are -- that you've agreed that shall be

5    forfeited as part of this Plea Agreement.  Do you understand

6    that?

7                    THE DEFENDANT:  Yes.

8                    THE COURT:  Now, before you and I go through your

9    constitutional rights and I take your plea.  Do you have any

10   questions of me about any part of this Plea Agreement?

11   Whether it's something you were hoping you could ask me

12   about or you just assumed I would go over with you?

13                   Is there anything you want to ask me at this time,

14   either  because it's a topic that you think that you wanted

15   to ask for or it's something that you don't understand?

16                   THE DEFENDANT:  No, Your Honor.

17                   THE COURT:  Anything from the Government?

18                   MS. ALLYN:  No, Your Honor.

19                   THE COURT:  Mr. Richman?

20                   MR. RICHMAN:  No, Your Honor.

21                   THE COURT:  With respect to this case, not unique

22   to your case, you are presumed innocent to all five of these

23   charges.

24                   If you plead guilty in just a few moments -- few

25   minutes you give up your right to be presumed innocent.

1          Do you understand that?

2          THE DEFENDANT:  Yes.

3          THE COURT:  You also have the right to have Mr.

4     Richman represent you in front of a jury.  And I'll explain

5     that phrase in just a minute.

6          But if you plead guilty in just a few minutes, you

7     give the right up to have -- he'll be here with you every

8     step of the way for this plea, Presentence Investigation

9     Report, sentencing, but there's not going to be a trial, so

10    you're giving the right up to have a lawyer represent you in

11    front of a jury.  Do you understand that?

12         THE DEFENDANT:  Yes.

13         THE COURT:  You have the right to remain silent.

14    You have the right against self-incrimination.  You're

15    giving those rights up as well, do you understand?

16         THE DEFENDANT:  Yes.

17         THE COURT:  You have the right to a speedy trial.

18    And, of course, you're giving that right up because we're

19    not going to have a trial.  Do you understand that?

20         THE DEFENDANT:  Yes.

21         THE COURT:  There will be 12 people on the jury.

22    I've talked -- I've used this phrase, jury trial.  All 12

23    would sit over here.

24         And the -- it's the Government's burden of proof

25    to prove by what we call proof beyond a reasonable doubt

1    that you committed one or more of these offenses.

2          And so that means a couple of things.  You don't

3    have to prove anything.  You don't have to convince anyone

4    you're innocent.

5          So today that means by pleading guilty to each of

6    the five charges, you give up your right to make the

7    Government prove this to a unanimous jury, because the vote

8    must be 12 to 0, 11-1 won't do it.  You give your right up

9    to make the Government prove this by proof beyond a

10   reasonable doubt.  Do you understand that?

11         THE DEFENDANT:  Yes.

12         THE COURT:  Now at that trial, as the lawyer's

13   well know, you don't have to do anything, because the

14   burden's on the Government.

15         Because as Ms. Allyn and Mr. Docherty are calling

16   each witness, you don't have to do anything, but you could

17   cross-examine each witness they called.

18         And then at some point they would turn to you, to

19   me, to the jury and say, We rest our case.  Or the

20   Government rests.

21         Then you'd have a decision to make.

22         Should I call my own witnesses?  You don't have

23   to.

24         Or should I testify knowing I'll likely be

25   cross-examined?  Or should I choose not to testify, usually

1      knowing two things.

2              One, that the Government can't then call you as a

3      witness.

4              And two, it's generally improper for a prosecutor

5      to get up and say, Well now you know he's guilty because he

6      hid behind the Constitution.  He wouldn't get up there and

7      talk to you.

8              Usually a defendant can't -- or a prosecutor can't

9      comment on the silence of a defendant, or their failure to

10     take the witness stand.

11             So today that means you're giving those rights up

12     associated with going to trial, because there's going to be

13     no trial.  Do you understand that?

14             THE DEFENDANT:  Yes.

15             THE COURT:  Two other rights.  One relates to that

16     waiver of pretrial motions.  Before I get to that, I'll --

17     I'll talk about another right that really every defendant

18     gives up in every case and when they plead guilty.

19             If you plead guilty in a few moments you can't

20     come back to me or a higher court and say, Judge I didn't do

21     it.  I'm going to fight one or all five counts, I didn't do

22     it.  I'm going to contest my guilt.

23             You give up the right to contest or appeal to me

24     or a higher court any of these offenses if you plead guilty.

25     Do you understand that?

1              THE DEFENDANT:  Yes.

2              THE COURT:  The other one that relates directly to

3      that phrase, waiver of pretrial motions is this:

4              If you plead guilty shortly you can't come back to

5      me or a higher court and say, Judge, of course I'm guilty,

6      otherwise I wouldn't have pled guilty to those five crimes.

7              But I should not have been in your courtroom,

8      because before I got there, I got -- my constitutional

9      rights were violated.  That's how I got caught.  That's how

10     I got indicted.

11             If and when a defendant says that, they could mean

12     a wiretap, search warrant, statement taken, search seizure,

13     stop.

14             The point is, today if you plead guilty shortly,

15     you give up the right to make any claim like that to me or a

16     higher court.  Do you understand that?

17             THE DEFENDANT:  Yes.

18             THE COURT:  Before I formally take your pleas to

19     each of the offenses, do you have any questions of me about

20     your constitutional rights?  Whether it's something I

21     mentioned, or you were hoping or assuming that I would?

22             THE DEFENDANT:  No, Your Honor.

23             THE COURT:  Counsel?

24             MS. ALLYN:  No, Your Honor.

25             THE COURT:  Mr. Richman?

1              MR. RICHMAN:  No.  Thank you.

2              THE COURT:  Then I'll go through those with you

3    now.

4              As to Count 1, an Illinois indictment that charges

5    with you possession between in or about -- around October of

6    2017, to on or about February 27th of 2018, in the Central

7    District of Illinois of a machine gun, do you plead guilty

8    or not guilty?

9              THE DEFENDANT:  Guilty.

10             THE COURT:  As to Count 2, entitled conspiracy to

11   interfere with commerce with threats and violence from on or

12   about August 20th -- August of 2017, to at least March 10th

13   of 2018, in Ford County in the Central District of Illinois

14   and elsewhere, do you plead guilty or not guilty?

15             THE DEFENDANT:  Guilty.

16             THE COURT:  As to Count 3, attempted arson, on or

17   about November 7th, 2017, in Champaign County, in the

18   Central District of Illinois, do you plead guilty or not

19   guilty?

20             THE DEFENDANT:  Guilty.

21             THE COURT:  Moving on to the Minnesota indictment.

22             As to Count 2, intentionally obstructing and

23   attempting to obstruct by the force and the threat of force

24   and by means of fire and explosives in the free exercise of

25   religious beliefs, on or about August 5th, 2017, in the

1    State and District of Minnesota, do you plead guilty or not

2    guilty?

3              THE DEFENDANT:  Guilty.

4              THE COURT:  As to Count 4, I'll move on to that,

5    carrying and using a destructive device, during in and in

6    relation to a crime of violence also on or about August 5th

7    of 2017, do you plead guilty or not guilty?

8              THE DEFENDANT:  Guilty.

9              THE COURT:  Do you understand by entering each of

10   these pleas, you give up those constitutional rights that we

11   just discussed, including your right to go to trial?

12             THE DEFENDANT:  Yes.

13             THE COURT:  Do you make any claim today that you

14   are innocent of any of these charges?

15             THE DEFENDANT:  No.

16             THE COURT:  Going to the facts of the case, and

17   there will be no surprise questions from me, I'll work off

18   what's called the factual basis in the Plea Agreement.

19             It states here, excuse me, again, that during the

20   summer of 2017, a codefendant and coconspirator, Michael

21   Hari, started a militia group in central Illinois.  And this

22   militia group was called initially "Patriot Freedom

23   Fighters," was that true?

24             THE DEFENDANT:  Yes.

25             THE COURT:   Although the name was changed after

1    the bombing of the Islamic Center here in Minnesota, to

2    "White Rabbits," is that also true?

3              THE DEFENDANT:  Yes.

4              THE COURT:  Then it says by late July and early

5    August of 2017, the members of the militia group Hari,

6    yourself, Michael McWhorter, and at least five other people.

7    Is that also true?

8              THE DEFENDANT:  Yes.

9              THE COURT:  Then it says that you admit and

10   concede that the Government has sufficient evidence to prove

11   beyond a reasonable doubt that on a date that is not known

12   precisely, but sometime during the two weeks immediately

13   proceeding August 4th, 2017, two of your coconspirators,

14   Hari and McWhorter, drove from central Illinois, across the

15   state line, and into Indiana where they purchased about

16   approximately 20 pounds of black powder at a small gun shop.

17   Do you now know that to be true?

18             THE DEFENDANT:  Yes.

19             THE COURT:  Then it says on August 4th and

20   August 5th, 2017, that you, together with Hari and McWhorter

21   drove from central Illinois to Bloomington, Minnesota.  Is

22   that -- is that what -- did you go -- come here to

23   Bloomington, Minnesota on that date?

24             THE DEFENDANT:  Yes.

25             THE COURT:  Then it states, in order to avoid

1    apprehension by law enforcement that you drove a rented

2    truck -- and when I say you, I'm saying the Defendants.  The

3    three of you drove a rented truck and avoided toll roads

4    because you believe that cameras or toll plazas can record

5    license plate numbers.  And that you and McWhorter, at the

6    direction of Hari, left your mobile phones behind in

7    Illinois.  Did you?

8                THE DEFENDANT:  Yes.

9                THE COURT:  Then it says at a gas station on the

10   way from Illinois to Minnesota, approximately one hour

11   before entering Minnesota, that Hari filled an empty plastic

12   container with a mixture of gasoline and diesel fuel.  And

13   did he do that?

14               THE DEFENDANT:  Yes.

15               THE COURT:  And then it says inside the cab of the

16   rented truck was a pipe bomb built by Hari by packing some

17   of the black powder bought at the Indiana gun shop into a

18   segment of PVC pipe.  And that the PVC's pipe segment was

19   capped at both ends and a fuse was threaded through a hole

20   that had been drilled in one cap.  Is that true?

21               THE DEFENDANT:  Yes.

22               THE COURT:  It says that the fuse extended from

23   the outside of the pipe bomb to the black powder within the

24   bomb.

25                   And that at about the same time that the gasoline

1    and diesel fuel mixture was put into the empty plastic

2    container, Hari informed you and McWhorter that there was a

3    pipe bomb in the vehicle, and that that was going to be used

4    to bomb a mosque.  True?

5              THE DEFENDANT:  Yes.

6              THE COURT:  Then the three of you arrived at the

7    Dar al-Farooq Islamic Center in Bloomington, in the state --

8    as we now know in the State and District of Minnesota at

9    approximately 5:00 in the morning, on August 5th, 2017.  Is

10   that -- is that accurately -- the accurate time?

11             THE DEFENDANT:  Yes.

12             THE COURT:  And then it says that Hari parked the

13   rented truck in the mosque parking lot.  And that you and

14   McWhorter left the truck and approached the mosque.  Is that

15   what you did?

16             THE DEFENDANT:  Yes.

17             THE COURT:  And then it says that Hari gave you a

18   sledgehammer and told you to break a window in the mosque,

19   which you did.  Did you?

20             THE DEFENDANT:  Yes.

21             THE COURT:  And then it says McWhorter then lit

22   the fuse on the bomb and threw the bomb through the window

23   that you had broken.  Is that what happened?

24             THE DEFENDANT:  Yes.

25             THE COURT:  Then it says you threw the container

1    holding the gasoline diesel fuel mixture through the same

2    window as you had been told to do.  True?

3              THE DEFENDANT:  Yes.

4              THE COURT:  Then it says that you and McWhorter

5    then ran back to the rented truck and got in.  And once you

6    were inside the truck, Hari then drove out of the mosque

7    parking lot at high speed.  And then the three of you went

8    back to Illinois.  True?

9              THE DEFENDANT:  Yes.

10             THE COURT:  Now, it says here that you also admit

11   and concede that the Government has sufficient evidence to

12   prove beyond a reasonable doubt that the pipe bomb exploded

13   inside imam's office at the Islamic Center.  And that the

14   explosion caused extensive blast damage to that office.

15             The explosion also ignited the gasoline and the

16   diesel fuel mixture which started a fire.  And the building

17   sprinkler system activated and the fire was promptly

18   extinguished.

19             But the fire and sprinklers caused fire and water

20   damage within the Islamic Center.  And at the time of the

21   explosion, the mosque was occupied, as morning prayers had

22   been just about to start.  And that the imam's office was

23   unoccupied and the bombing caused no fatalities or injuries.

24             And so I just want to make certain that all of

25   these things -- both the things that you admit happened and

1    then you learned what happened to the mosque, do you admit

2    and agree that that's an accurate statement of what

3    happened?

4              THE DEFENDANT:  Yes.

5              THE COURT:  Then it goes on to state that the

6    Islamic Center -- need some water or anything?

7              MR. RICHMAN:  I'm fine.  Thank you.

8              THE COURT:   The -- it goes on to state that the

9    Islamic Center was targeted because it's an Islamic house of

10   worship, that true?

11             THE DEFENDANT:  Yes.

12             THE COURT:  Then it says by bombing a mosque, the

13   three of you intended to interfere with the free exercise of

14   religious -- religious belief by Muslims.  Also true?

15             THE DEFENDANT:  Yes.

16             THE COURT:  Then it says that you further intended

17   by this bombing to communicate to Muslims that they were not

18   welcome in the United States and should leave the country.

19   Is that also true?

20             THE DEFENDANT:  Yes.

21             THE COURT:   In addition it says you believe

22   because Hari told you so, that the Islamic Center was

23   targeted, rather than different mosque, because it was far

24   enough away from central Illinois that the three -- three of

25   you thought it was unlikely they would be suspected in the

1   bombing and that it was a focal point for terrorist

2   recruiting.  All of that true?

3               THE DEFENDANT:  Yes.

4               THE COURT:  Now the bombing of the Islamic Center

5   was, in and affected, interstate commerce, was committed by

6   means of fire and explosives, involved the use of force, and

7   that you, Hari and McWhorter, carried and used a destructive

8   devise, a pipe bomb, during and in relation of the bombing

9   of the Islamic Center.  Is that all true?

10              THE DEFENDANT:  Yes.

11              THE COURT:  And part of that's here because even

12  though they don't have to approve you know what interstate

13  commerce is or anything else, by coming across state lines,

14  by using things that are manufactured in different states

15  and brought in, that is affecting interstate commerce.  Do

16  you understand that?

17              THE DEFENDANT:  Yes.

18              THE COURT:  Now it states beginning no later than

19  October of 2017, that you, together with Hari and McWhorter,

20  possessed two machine guns in the Central District of

21  Illinois.  Is that true?

22              THE DEFENDANT:  Yes.

23              THE COURT:  Then it says that these weapons had

24  been illegally converted to fire in full automatic mode, a

25  mode of firing in which the guns fire rapidly for as long as

1    the trigger is held down and the ammunition lasts.   True?

2              THE DEFENDANT:  Yes.

3              THE COURT:  Then it says on or about November 7th

4    of 2017, that you and Hari attempted to set on fire the

5    Women's Health Practice in Champaign in the Central District

6    of Illinois.  Did you do that?

7              THE DEFENDANT:  Yes.

8              THE COURT:  It says the Women's Health Practice

9    offered a variety of medical services, including abortions.

10   True?

11             THE DEFENDANT:  Yes.

12             THE COURT:  Then it says that you broke a window,

13   placing a centering device in the Women's Health Practice

14   and lit a strip of magnesium that was being used as a fuse.

15   However, the device did not ignite.  Is that true?

16             THE DEFENDANT:  Yes.

17             THE COURT:  Then it says that you concede and

18   admit the Government has sufficient evidence to prove beyond

19   a reasonable doubt that law enforcement responded to the

20   Women's Health Practice when a receptionist, arriving to

21   open the Women's Health Practice on the morning on

22   November 7, 2017, found the unexploded device on the floor.

23   Do you now know that to be true?

24             THE DEFENDANT:  Yes.

25             THE COURT:  Then it says that law enforcement

1    determined the device to be a length of PVC pipe capped at

2    one end and covered in duct tape at the other end,

3    containing an incendiary powder mixture, one of whose

4    components was thermite.  Is that also true?

5            THE DEFENDANT:  Yes.

6            THE COURT:  Then it says the device also contained

7    a fuse, which is a strip of magnesium metal, which could be

8    used to ignite the incendiary mixture.  And that when

9    thermite is ignited by heat, it creates brief bursts of heat

10   and high temperature.  And that actually Hari had

11   constructed this device and rented a truck, in which the

12   Defendants, including you, traveled to the Women's Health

13   Practice that day.  True?

14           THE DEFENDANT:  Yes.

15           THE COURT:  Then moving on to Page 7, for the

16   record.

17           States here that you admit and concede that the

18   Government has sufficient evidence to prove beyond a

19   reasonable doubt, that the Women's Health Practice used this

20   building in Champaign, Illinois in interstate commerce.

21   That medical services were provided at that location.  And

22   that the Women's Health Practice purchased and disbursed

23   medical supplies, some of which had moved across state

24   lines.  And maybe even from one country to our -- to the

25   United States at that building.  And that at that building,

1        the Women's Health Practice also processed health insurance

2        payments for the medical services provided by the Women's

3        Health Practice.  And that many of those payments came from

4        carriers outside of Illinois.

5               Do you now -- and if you didn't do know that, you

6        know that to be true?

7               THE DEFENDANT:  Yes.

8               THE COURT:  And, again, as I mentioned before, not

9        unique to your case, they don't have to prove that you even

10       knew or know what interstate commerce is or what their

11       practice was.

12              What they have to prove is exactly what you've

13       acknowledged.  That, well, here's -- here's what that

14       practice was, in terms of how they operated, just not within

15       Illinois, but to purchase things, and did business both

16       within the state, out of state.  And even had some things

17       that transferred from out of the country, so.

18              Then it goes on, on or about December 16th, of

19       2017, that you, together with Hari and McWhorter, as well as

20       four other people, participated in what turned out to be a

21       home invasion of the town of Ambia, Indiana.

22              Did you participate in that?

23              THE DEFENDANT:  Yes.

24              THE COURT:  Then it says that the three of you,

25       and one other person, carried firearms, two of which had

1    been illegally converted to machine guns.  Is that true?

2              THE DEFENDANT:  Yes.

3              THE COURT:  Then it says that the three of you,

4    and one other person, masqueraded as police officers, and

5    robbed the inhabitants of the house.  Also true?

6              THE DEFENDANT:  Yes.

7              THE COURT:  Then in order to reach Ambia, Indiana

8    from central Illinois, obviously the three of you, and four

9    other people, crossed state lines, Illinois to Indiana.  And

10   that this robbery there took place in another state and

11   affected interstate commerce.  Do you understand that?

12             THE DEFENDANT:  Yes.

13             THE COURT:  It says you admit that this robbery

14   did, therefore, affect interstate commerce.  Also true?

15             THE DEFENDANT:  Yes.

16             THE COURT:  And then some of the victims of the

17   robbery were physically restrained during the commission of

18   the robbery?  Is that true?

19             THE DEFENDANT:  Yes.

20             THE COURT:  And, of course, it's stated here that

21   you acknowledge you obtained no money, though, from the home

22   innovation.  Also true?

23             THE DEFENDANT:  Yes.

24             THE COURT:  Now it states that together with Hari,

25   and McWhorter, as well as others, also performed and

1   perpetrated armed robberies of two Wal-mart stores.  One in

2   Watseka, Illinois, on or about December 4, 2017.  And one in

3   Mount Vernon, Illinois on or about December 17th, 2017.

4        Are those -- are those accurate dates and places?

5        THE DEFENDANT:  Yes.

6        THE COURT:  I'm going to sneak in a little drink

7   of water here.

8        Oh, I didn't have a big sneeze like you, Mr.

9   Richman, so.

10       Although Wal-mart is a large corporation that does

11   business in all 50 states, as you may or may not be aware

12   and many foreign countries.  Do you know that to be true?

13       THE DEFENDANT:  Yes.

14       THE COURT:  And so, therefore, you admit and

15   acknowledge that these two armed robberies involve a company

16   that does in, and affect, and utilize interstate and foreign

17   commerce.  Do you admit to that, sir?

18       THE DEFENDANT:  Yes.

19       THE COURT:  Then it says that the conspirators,

20   meaning you and the other individuals, obtained

21   approximately $1,047, from the Watseka robbery.  And no

22   money, though, from the Mount Vernon robbery.  Is that also

23   true?

24       THE DEFENDANT:  Yes.

25       THE COURT:  However, during the perpetration of

1    the Watseka robbery, you admit that you carried fake

2    firearms into that Wal-mart, true?

3                 THE DEFENDANT:  Yes.

4                 THE COURT:  Now it states that on or about January

5    17th of 2018, that you, together with Hari and McWhorter,

6    sabotaged a portion of the railroad track used by the

7    Canadian National Railway outside of the town of Effingham,

8    Illinois.  Did you do that?

9                 THE DEFENDANT:  Yes.

10                THE COURT:  Then it states that Hari then sent a

11   communication to the Canadian National Railway by placing a

12   message on the Canadian National Railway on an inquiry form.

13                And that what the communication or message stated

14   was that further sabotage directed at the railway would

15   occur unless the Canadian National Railway paid -- paid the

16   defendants, meaning, including you, an amount of particular

17   money, equivalent -- equivalent to slightly more than

18   $190,000.  Is that what happened?

19                THE DEFENDANT:  Yes.

20                THE COURT:  Then it says that before you

21   participated in this sabotage of the railroad track, that

22   you knew Hari was going to send this communication to the

23   Canadian National Railway?

24                THE DEFENDANT:  Yes.

25                THE COURT:  Is that true?

1          THE DEFENDANT:  Yes.

2          THE COURT:  You knew?

3          Then it states that you admit and acknowledge that

4   the intent of the communication by Hari was to threaten or

5   extort money and funds from the Canadian National Railway.

6   True?

7          THE DEFENDANT:  Yes.

8          THE COURT:  Then it states that you also agree and

9   concede that the Government has evidence sufficient to prove

10  beyond a reasonable doubt that the Canadian National Railway

11  is headquartered in Montreal, Quebec and transports freight

12  throughout Canada and the United States.  Therefore that

13  involves -- and this target of the extortion attempt

14  involved the railway.  And in so doing affected interstate

15  and foreign commerce.  True?

16         THE DEFENDANT:  Yes.

17         THE COURT:  And as it turns out, you did not

18  receive any money, though, from that Canadian National

19  Railway -- from the Canadian National Railway as a result of

20  this extortion attempt.  True?

21         THE DEFENDANT:  Correct.

22         THE COURT:  Did you participate and commit these

23  crimes voluntarily?

24         THE DEFENDANT:  Yes.

25         THE COURT:  Okay.  Any additional inquiry on a

1    factual basis by the Government?

2              MS. ALLYN:  No, Your Honor.

3              THE COURT:  By --

4              MR. RICHMAN:  No, Your Honor.

5              THE COURT:  The Court finds that Mr. Morris has

6    knowingly and voluntarily entered each of these pleas to the

7    five crimes.

8              I also find that he's purely acknowledged and

9    admitted a proper and adequate factual basis for each of the

10   pleas.  So I accept and record the guilty pleas for all

11   purposes at this time.

12             And I order a presentence investigation report to

13   be done.

14             And the lawyers know exactly how that works.  And

15   while it does not vary by case, by defendant, by judge in

16   our district,  I'm going to take a couple minutes to explain

17   it.

18             One, because I think it's a very fair process.

19             And two, it does vary from in other districts,

20   state or federal.

21             And so you may be aware that a presentence

22   investigation report will not just give me the additional

23   details about the crimes you've committed, but also it will

24   give me details and more than a pretrial services report on

25   who you are, your background.

1            And then procedurally, when that first report --

2       the first draft, I'll call it, is done, you and your

3       attorney, and the Government's Counsel, you all see it

4       before I do.

5            It would be fine if I saw it with you, but I would

6       tell you if we had -- if I got copied or blind copied.

7            We don't here in our district.  And the lawyers

8       are aware of this, for a very important reason.

9            Your attorney knows he can sit down, go over it

10      and make what are called legal and factual objections.  And

11      to speak in plain language, your attorney knows he can look

12      at it, go through it with you.

13           Then each attorney can call a probation officer,

14      walk into their office, e-mail them, write them, mail them,

15      and say, We object to these paragraphs.  We want this taken

16      out, we want this added.

17           Now, why -- and the probation officer may agree or

18      not agree to do that, whether it's requested by the United

19      States Attorney's Office or by your attorney.

20           Now, why have I taken the time to tell you this?

21           Well, when I get the final draft of the report, I

22      admit to you, I don't start on the first page.

23           I flip to the back.  And there will be a fancy

24      word, Addendum, and here's what it will say, The Defendant

25      and his lawyer object to the follow paragraphs for the

1    following reasons.

2            Or it will say, No objections.  Which means either

3    there never were any.  Or your lawyer persuaded the

4    probation officer to make some changes.

5            I'll look for the same thing from Counsel for the

6    Government.  Because I like to have that in my mind as a

7    read through the report.

8            As soon as Ms. Sampson gets the final report,

9    she'll call your attorney, Government's Counsel, and say,

10   Can we agree on a sentencing date?  And -- and then, when --

11   in almost all cases we do.

12           Because in some cases the Defendants want certain

13   people there for the sentencing, and sometimes not.

14           And in some cases, Government wants people,

15   whether it's the law enforcement agents, victims, other

16   people here, sometimes not.

17           And then at that time you'll have a chance to say

18   as little or as much as you want  here in this courtroom.

19           Do you have any questions of me about anything

20   that has happened today, Mr. Morris?

21           THE DEFENDANT:  No.

22           THE COURT:  Anything further on behalf of the

23   United States?

24           MS. ALLYN:  No, Your Honor.

25           THE COURT:  Mr. Richman?

1          MR. RICHMAN:  Nothing further, Your Honor.

2          THE COURT:  Does probation need to chat with

3     anyone here?

4          MR. SMITH:  I'll just speak with the parties

5     briefly, Your Honor.

6          THE COURT:  All right.  Then we are adjourned.

7          MR. RICHMAN:  Thank you, Your Honor.

8          (Court adjourned at 12:12 p.m.)

9                    **REPORTER'S CERTIFICATE**

10

11          I, Lynne M. Krenz, do certify the foregoing
      pages of typewritten material constitute a full, true and
      correct transcript of my original stenograph notes, as they
12     purport to contain, of the proceedings reported by me at the
      time and place hereinbefore mentioned.

13

14                    /s/Lynne M. Krenz
                      Lynne M. Krenz, RMR, CRR, CRC
15

16     Date: February 19, 2019

17

18

19

20

21

22

23

24

25