UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 18-150 (DWF/HB)
Criminal No. 18-291 (DWF/HB)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | DEFENDANT'S POSITION |
| v. | ) | ON SENTENCING FACTORS |
| | ) | |
| JOE MORRIS, | ) | |
| | ) | |
| Defendant. | ) | |

Joe Morris was "so influenced by the people he was with. If he got into a wrong group, he was going to do whatever they said or did."
　　—Luke Geiser, Caneyville, KY, PSR ¶ 149.


"Mike Hari was Joseph's hero."
　　—Hannah J. Eby, Caneyville, KY, Def. Ex. ? at ?


"I will have to live with this on my concince [*sic*] for the rest of my life. I would ask forgiveness from my victims knowing I deserve no mercy but ask for it anyway."
　　—Joe Morris, PSR ¶ 65.

---

　　In February 2018, law enforcement, including the FBI, had come to Clarence,

Illinois to investigate Emily Hari's[1] criminal activities, including explosive devices

---

[1] Mr. Morris knew Ms. Hari as Mike Hari. On July 1, 2021, however, Ms. Hari legally changed her name to Emily Claire Hari. Thereafter, this Court ordered that the docket of this matter be amended to reflect Ms. Hari's name change. *See* Doc. No. 486. Accordingly, this memorandum refers to Hari as Emily Hari and uses her preferred female pronouns. The materials submitted with this memorandum, many of which were prepared before Ms. Hari's name change, continue to refer to her by her previous name.

planted in a neighbor's shed. Concerned that federal agents might search her offices, Hari moved a large duffle bag of weapons out of the building. But the vault in her building still contained a treasure trove of incriminating evidence, including uniforms, masks, tactical vests, handcuffs, helmets, electronic equipment such as scanners and jammers, and other equipment used in the illegal activities of the White Rabbits.

Hari's solution was simple. She prepared a sign that she posted on the door of the vault which read: "This vault is rented by Joseph Morris." Problem solved.

Joe Morris was the perfect patsy for Hari. Joe had known Hari since Joe was 8 years old, when Hari insinuated herself into Joe's family. Hari was "like a father" to Joe. At the time of these offenses, no one in the world was closer to him than Hari. Tr. I:35.[2] When Hari asked Joe to do something, Joe did it. Tr. I:59. Joe trusted Hari implicitly.

Emily Hari used her undue influence over Joe Morris to embroil him in Hari's hateful, misguided crime spree. Struggling with mental illness and believing, based on Hari's assurances, their mission was endorsed by the United States government, Joe agreed to work with Hari to commit a series of heinous crimes.

Joe Morris is not a man with strong political beliefs. He had only the vaguest sense of the reasons for the crimes he was committing. There is little question that

_____

[2] Mr. Morris testified at Emily Hari's trial on November 13 and 30, 2020. Undersigned counsel has received a transcript of his testimony in two volumes, each of which is paginated beginning on page 1. The November 13 testimony is referenced as Tr. I, followed by the page number. The November 30 testimony is referenced as Tr. II, followed by the page number.

he would not have committed these crimes had it not been for Hari's influence. Hari exploited and manipulated Joe, indoctrinating him with her hateful bile.

A significant downward variance is appropriate to reflect these factors. Mr. Morris requests a sentence of ten years.

Facts

1.    Personal History

Joe Morris is 26 years old. Before he fell in with Hari, he had no criminal record. PSR ¶¶ 126-131.

Joe's early childhood was abusive and dysfunctional, characterized by emotional, verbal, physical and sexual abuse, resulting in his being removed from his parent's custody and eventually adopted by his maternal grandmother and her husband. *See* Def. Ex. 1 at 3 (Report of Ernest Boswell, Ph.D) (hereinafter "Boswell Report).

Joe was the fourth of 10 children born to his mother, Kimberly DeRidder, and six different men. *See* Ex. 4 at 6 (Sent. Mitigation Report by Amy Butler) (hereinafter "Butler Report"). Joe's father, Peter Wehmeyer, was actually married to Kimberly's cousin, Tammy Elliot. *Id*. Joe's name at birth was Peter Alexander Wehmeyer DeRidder. PSR ¶ 134.

When he was two years old, Joe and his siblings were removed from his parents' custody as a result of allegations of child abuse and neglect. *Id*. At the time, Peter Wehmeyer was living with Kimberly and two other women—her sister, and

3

Tammy Elliot (Peter's wife and Kimberly's cousin). Kimberly had four children by that time, including Joe, and was pregnant with a fifth. *Id.* at 7.

The authorities found the children living in rooms that smelled of urine and were littered with clothes and dog food. The home was condemned as unsafe, and after the children were removed, was torched by arsonists. *Id.* The authorities were unable to determine which of the children belonged to which parents "because they have lied so much." *Id.*

The abuse was so significant that all three adults were charged with child abuse. Kimberly ultimately pleaded guilty to felony child neglect. An additional charge of battery on a child was dropped. *Id.* She testified at trial against Joe's father. She explained how Mr. Wehmeyer insisted on being called "God" or "the maker of everything." *Id.* He devised bizarre punishments for the children for the most minor perceived infractions. *Id.* at 8. One girl was chained to her bed at night, where she had no choice but to urinate on herself. The children were regularly beaten, were rarely bathed, and were fed only one meal a day. *Id.* Peter Wehmeyer, Joe's father, was convicted of child abuse. PSR ¶ 134.

In 2001, Ms. DeRidder's parental rights were terminated due to a pattern of abuse and neglect. Butler Report at 8. Joe and his siblings became wards of the state. *Id.* At that point, Joe and two of his siblings were adopted by Kimberly's mother, Pearl Morris, and her husband Glenn Morris. Pearl and Glenn changed Joe's name to Joe Allen Morris. PSR ¶ 134.

Joe was five years old when he was adopted by his grandmother and step-grandfather. Having already experienced years of abuse and neglect at the hands of his biological parents, he acted out with behavioral problems. Butler Report at 9. As they are the first to admit, Glenn and Pearl Morris were not well-equipped to care for three young children, especially ones who had been traumatized. *Id.*; PSR ¶ 136. Neither Glenn nor Pearl worked. Both received disability payments. PSR ¶ 135. Glen had regular seizures. Pearl suffered depression and anxiety. In addition, she was "nearly illiterate," according to her husband. *Id.* at ¶ 136.

Joe grew up believing Glenn and Pearl were his biological parents and that Kimberly, who he rarely saw, was his sister. Butler Report at 13; Boswell Report at 6. He did not learn the truth until he was 11.

The Morris's were overly strict with Joe and his siblings. The children were expected to do most of the household chores and had little time to play. PSR ¶ 136. Glenn was extremely controlling, micromanaging the children's time. Boswell Report at 6. Joe described his childhood as "being treated more like a slave and less like a child." *Id.* at 16. He explained, "I was working 10-12 hours a day when I was not in school…If I said anything wrong I got punished. If I did not eat my green beans I was punished." PSR ¶ 136.

Punishment consisted of paddling and "time outs" confined to a closet.  Butler Report at 10. During one of these time outs, Joe was playing with matches. He was lighting a mop on fire and blowing it out. PSR ¶ 146; Boswell Report at 7, 16. Unfortunately, he lost control of the fire, and the house burned down. Although Joe

5

was only 7 at the time, Glenn was convinced he set the fire on purpose. Butler
Report at 10-11. Joe was confined in a psychiatric facility as a result of this episode.
*Id*. at 15.

Joe grew up believing his parents, Glenn and Pearl, hated him. *Id*. at 10.  In a
personal reflection, Joe wrote, "They always said 'I love you' but I always knew they
ment [sic] 'I hate you I wish you were never born.'"  Boswell Report at 16. He was
diagnosed, at age 8, as suffering from PTSD. Butler Report at 16.

When Joe was thirteen, Glenn and Pearl sent Joe to live in a para-Amish
community in Caneyville, Kentucky. As is discussed below, that move was at Emily
Hari's suggestion, who had become Glenn Morris's mentor and parenting advisor.
PSR ¶ 137. This move was in response to Joe's increased rebelliousness typical for a
teenager, but with which Glenn was unable to cope. *Id*.

The Caneyville community was a farming community, which followed Amish
precepts. It had no electricity or running water. Tr. II:84-85.  Joe worked on the
farm and went to school. In his spare time, he played board games and read books.
Tr. I:10.

When he got there, Joe was behind his age cohort both academically and
emotionally. Butler Report at 11. He started school in the fourth grade, although he
was 14. *Id*. at 23. The community school only went to eighth grade. Although Joe
did not complete eighth grade, he was given a "certificate of effort." *Id*. at 24. He has
essentially a sixth-grade education. *Id*. at 23.

Once Joe adjusted to life in Caneyville, he did well there. He remained in the Amish community until he turned 18. During those five years, Glenn and Pearl visited once. Tr. I:12. Other than his time in school, Joe did chores on the farm, including cutting firewood, working in the stove shop, and caring for the farm animals. Tr. II: 97; Butler Report at 29. At age 18, he returned to Roberts, Illinois to be with his parents and spent time in Mexico with Hari. PSR ¶ 139.

2.      Influence of Emily Hari

When Joe was 8 or 9, Glenn Morris met Hari. Tr. I: 7. Hari became Glenn's mentor. PSR ¶ 137. Glenn looked to Hari for advice on how to discipline his children. Tr. I:8. Hari advised Glenn on the importance of consistent discipline, including paddling his children. Butler Report at 10. Although Glenn knew Hari had been convicted of abducting his own daughters, Glenn "completely trusted him." PSR ¶ 137. In a letter to the Court, Glenn described Hari's role as follows: "The time I spent with Mike Hari I had followed what he had told me I should do, for as I always felt that I had to have guidance in raising my children. I followed what he told me to do, for as am my eyes I simply didn't know how to be a good father." Def. Ex. 5 at 20. As Joe reported, within six months of befriending Glenn, "Hari was making most of the decisions regarding the family." Boswell Report at 7.

For example, when Joe was a child, he was medicated for mental illness. It was Hari who convinced his parents that Joe no longer needed his medications, and he should stop taking them. Tr. II:8.

And it was Hari who, when Glenn and Pearl were having trouble managing teenager Joe, recommended that Joe should be sent to live with the Amish in Caneyville, Kentucky. PSR ¶ 147. Once again, they followed Hari's advice, having long ago outsourced their parenting responsibilities to him.

Hari was affiliated with the para-Amish community in Caneyville. Butler Report at 2. She visited Joe once or twice a year while Joe was there. Boswell Report at 7. After Joe left the Amish community, he went to live with Hari in Mexico, who was working to create a conservative religious community centered around a watermelon farm. Butler Report at 25. Although the farm was in a state of disrepair and was under the influence of Mexican drug cartels, Joe stayed there with Hari for eight months. *Id.*; PSR ¶ 139.

By the time of the offense conduct, therefore, Joe viewed Hari as "like a father" to him. No one in the world was closer to him than Hari. Tr. I:35. When Hari asked Joe to do something, Joe did it. Tr. I:59. Unlike many people in Joe's life, he felt that Hari accepted him. Tr. I:18-19.

The people who knew both Hari and Joe say that Joe saw Hari as a hero. Butler Report at 2, 29. Hari exerted a tremendous influence on Joe. Glenn Morris explained: "I know Joe [Morris] well enough and I know Mike [Hari] well enough, that anyone could convince Joe [Morris] to do anything." PSR ¶ 148. Glenn also explained that "me and my wife, along with anyone else that knew Joe, along with other family members, . . . will say that Joe simply was following what Mike Hari,

which was a strong and close mentor of Joes, had told him was right to do, without Joe actually knowing the difference." Boswell Report at 18.

Jonathan Eby, who helped raise Joe in Caneyville, stated: "Due to the Hero role Mike [Hari] played in Joe's life, it gave Mike the unique influence for leverage to get Joe to participate in the illegal activities Joe is now facing consequences for." Butler Report at 31. Hannah Eby, Jonathan's wife, states, with respect to Hari: "He treated Joseph with kindness and respect and in Joseph's mind Mike [Hari] had saved him from the unhappy life he had before." *Id*. at 30. Similarly, Luke Geiser, who grew up with Joe in Caneyville, states: "I felt like it was an unfortunate circumstance that Mike [Hari] was his hero and Mike [Hari] let him down." PSR ¶ 149.

Dr. Ernest Boswell, who completed a psychological assessment of Joe for sentencing, described Hari's role in Joe's life as follows:

> It is also important to consider that the family came under the influence of Mr. Michael Hari when Joe Morris was a young adolescent. Glenn Morris acknowledged that he turned over almost all decision making to Mr. Hari including decisions of where Joe Morris would live. As a consequence of Mr. Hari's influence Mr. Morris was sent to live with an Amish family.

Boswell Report at 30. Given this influence, Dr. Boswell opined "that Mr. Morris significantly relied on Mr. Hari as a father figure, friend and mentor. Mr. Morris relied on Mr. Hari for advice regarding how to assess and respond to various situations." *Id*. at 31. Finally, Dr. Boswell concluded as follows:

> The current examiner opines that Mr. Morris beliefs and actions were significantly impacted by Mr. Hari. . . . Mr. Morris trusted Mr. Hari as a respected mentor and was led to believe his actions were sanctioned

by individuals within the government. Mr. Hari used his position of interpersonal authority to manipulate Mr. Morris.  Mr. Hari took advantage of Mr. Morris's trust and engaged in a pattern of deceit and manipulation to foster Mr. Hari's plans and criminal activities.  It is noteworthy that Mr. Morris had no criminal record, adult or juvenile, before he fell under the influence of Mr. Hari.

*Id.*

3.     Mental Illness

Mr. Morris suffers from a serious and persistent mental illness. Boswell Report at 28; Def. Ex. 2 (Boswell Addendum) at 11 (hereinafter "Addendum"). Dr. Boswell diagnosed Mr. Morris as suffering from Schizophrenia (Multiple episodes, currently in partial remission), Persistent Depressive Disorder, Unspecified Anxiety Disorder, and Dependent Personality Disorder. Boswell Report at 26.

Joe's history of mental illness began as early as age 8.  *Id.* at 28. He experienced "some type of war going on inside me," which made it difficult for him to control his behavior. *Id.* at 11. After accidentally burning down the family house, he was committed to Pavilion Behavioral Health. There, he reported both auditory and visual hallucinations. *Id.* at 12, 28. He was prescribed Respiradal, an antipsychotic, and Ritalin. *Id.* at 12. At some point, Glenn and Pearl terminated these medications at Hari's direction.

When Joe was 16 and 17, he again began to experience auditory hallucinations. He heard voices, which he understood to be angels and demons. Boswell Report at 16. The voices continued while Joe was in Mexico with Hari. Rather than help him seek treatment, Hari assured Joe that his delusions were "the work of angels and he should pay attention to and heed them." *Id.* at 10, 28.

Joe did not resume psychotropic medications until after his arrest on this case. While in the Macon County, Illinois Jail, Joe reported seeing shadows, demons, and angels. He said he had been having these visions since he was 16. Boswell Report at 13. His delusions continued while at the Sherburne County Jail. After various diagnoses, the medical staff there finally diagnosed him with major depressive disorder and schizophrenia. Addendum at 6. Joe is currently being treated with antipsychotic medications, which have been steadily increased over the course of his detention over the last four years to control his visual and auditory delusions.

4.      Offense Conduct

In August 2017, after Joe had returned from working in Mexico with Hari, Hari met with Joe. Joe was living with Glenn and Pearl in Roberts, Illinois at the time. Tr. I:17. Hari took Joe for a ride in his car. Hari told Joe she had some work for him to help with. It wouldn't be exactly legal, Hari said, but she had been ordered by Steve Bannon and a CIA operative who went by the code name "Congo Joe" to harass the untouchables. *Id.* at 19. The untouchables, Hari explained, were the people the government couldn't touch itself, people like George Soros. They needed Hari and those working with him to give the untouchables a push to give power back to the common people. Boswell Report at 19. Hari said there were a network of militia groups across the country working toward this goal, and she was the head of the Illinois contingent. They had to do four jobs before they got paid.

The jobs would be whatever hindered their enemies—the untouchables. These were jobs the government could not do itself.

Initially, Joe was reluctant to join with Hari. Tr. I: 20. A couple days later, however, he changed his mind and told Hari he was in. Joe changed his mind because he thought he was about to lose his job, and he needed something to do. *Id.*

The next day, Hari told him there was a job up north which was on a need-to-know basis. *Id.* at 21. Hari would fill him in on the details when they got there. It was not until an hour outside of Bloomington, Minnesota that Joe learned he would be bombing a mosque. Hari told Joe that the mosque was a recruiting center for ISIS. Boswell Report at 19.

The White Rabbit crime spree that followed the mosque bombing is well-documented in the materials before the Court.

Joe believed Hari. Hari had never led him astray before, and he trusted her. To the extent he understood Hari's objectives at all, he thought they were doing something important, something the government wanted, but could not do itself. Other than that, the details were hazy to Joe. He knew they were targeting a mosque, but he was not sure what a mosque was. Tr. I: 34. He knew George Soros was one of their enemies, but he did not know who George Soros was.  Tr. I:18; Boswell Report at 19.  Hari explained that George Soros owned Bank of America and helped to fund terrorist organizations such as Antifa and ISIS. Tr. I: 18. Joe knew Antifa stood for antifascist, but he could not have explained what a fascist was or why antifascists were their enemies.

Discussion

Joe Morris has fully accepted responsibility for his offense conduct. The crimes he committed were heinous, and he understands that. He is haunted by his involvement in these crimes, and he is remorseful for the harm he caused to so many people.

But to simply sentence Joe on the basis of the seriousness of his crimes, without considering the combination of factors that led him to this point, would do him a grave injustice. The guidelines and the mandatory minimums applicable to this case do not change the role of the sentencing judge in every criminal case:

> It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.

*Koon v. United States*, 518 U.S. 81, 113, 116 S. Ct. 2035, 2053 (1996). *See also Pepper v. United States*, 131 S. Ct. 1229, 1240 (2011) ("For the determination of sentences, justice generally requires consideration of more than the particular acts by which the crime was committed and that there be taken into account the circumstances of the offense together with the character and propensities of the offender") (*quoting Pennsylvania ex rel. Sullivan v. Ashe*, 302 U.S. 51, 55 (1937)).

Although the penalties applicable to Joe are similar to those to which Hari was subject, the two could not be more dissimilar. Before Hari embroiled him in his twisted crimes, Joe Morris had never been convicted of a crime. He was 22 years old. He lived a simple life, working as a laborer at Rocket Supply in Roberts,

Illinois. PSR ¶ 175. Had Hari not enlisted him, exploiting the undue influence he played in Joe's life, Joe would never have committed any of these crimes. Hari weaponized Joe's naivete and mental illness struggles.

Joe's childhood history of abuse, dysfunction, and neglect, the fact that he was suffering from an untreated serious and persistent mental illness at the time of these offenses, and Hari's manipulation of Joe for his own twisted purposes are all factors this Court should consider when contemplating an appropriate sentence. In addition, Joe began his cooperation almost immediately upon his arrest and then testified at Hari's trial. A sentence of 10 years is sufficient, but not greater than necessary, to achieve the purposes of sentencing under 18 U.S.C. § 3553(a).

## I.   A Downward Variance Is Warranted to Reflect Mr. Morris's Reduced Mental Capacity

In U.S.S.G. § 5K2.13, the Sentencing Commission identified diminished capacity as an encouraged basis for a downward departure from the otherwise applicable guideline range. That provision states:

> A downward departure may be warranted if (1) the defendant committed the offense while suffering from a significantly reduced mental capacity and (2) the significantly reduced mental capacity contributed substantially to the commission of the offense.

This Court need not do a close analysis of § 5K2.13 because whether it applies in full or not, Joe's mental illness struggles are plainly part of his "history and characteristics," which, under § 3553(a), this Court's sentence must reflect. But, in fact, both prongs apply here. First, as Dr. Boswell has opined, at the time of these offenses Joe was suffering from an untreated serious and persistent mental illness

14

(SPMI). The Macon County, Illinois jail, the Sherburne County jail, and Dr. Boswell all agree that he suffers from schizophrenia, depression, and other mental illnesses. For the last four years, the jails have been treating him with antipsychotic medications to reduce Joe's visual and auditory delusions.

In the years before, the mosque bombing, Joe had confided in Hari about the imaginary voices that plagued him. Rather than encourage him to seek treatment, Hari advised him to heed the angels who were communicating through him. Boswell Report at 10.

Dr. Boswell has opined that "Mr. Morris suffered from the noted SPMI prior to and following the bombing of the mosque." Addendum at 11. The evidence strongly supports this conclusion.

There is little question that Joe's mental illness and related intellectual deficits significantly contributed to his involvement in these offenses. He lacks the ability to engage in sophisticated reasoning. Boswell Report at 22. Rather, he is "a rather blunted individual who is naïve and easily persuaded by outside peer influence." *Id.*

Moreover, Dr. Boswell has diagnosed Joe as suffering from persistent depressive disorder, which began in childhood. *Id.* at 25. He suffered trauma at the hands of his biological parents and felt hated by his adoptive parents, who outsourced parenting decisions to Hari and shipped him off to a community of strangers when they could no longer manage him. For five years, they bothered to see him only once. According to Dr. Boswell, "The net effect of these experiences

15

created significant defects in Mr. Morris's self-esteem, self-identity and worth as a

human being.  He felt unloved, unaccepted and unworthy." *Id.* at 25. Hari filled the

void, presenting himself as parent, mentor, advisor, and friend.

> Finally, and most significantly, Dr. Boswell reports:

> Mr. Morris presents with substantial history of ineffective
> interpersonal difficulties including chronic feelings of inadequacy, and
> negative self-evaluation.  Mr. Morris acknowledged having excessive
> difficulty making decisions without advice and reassurance from
> others. His adult history demonstrates a pattern of difficulty making
> decisions and/or initiating projects due to underlying lack of self-
> confidence, needing to obtain nurturance and approval of others,
> feeling overwhelmed and helpless when faced with making personal
> decisions.

*Id.* at 26. Dr. Boswell characterizes Joe's interpersonal difficulties as "a defective

personality structure in which he seeks or allows others to make decisions for him

over a wide array of content." *Id.* Dr. Boswell traces this personality defect to Joe's

history of childhood trauma, overcontrolling adoptive parents, and being shipped to

an Amish community on Hari's say-so. *Id.*

> Joe's defective personality structure, according to Dr. Boswell, warrants a

diagnosis of dependent personality disorder. According to Dr. Boswell:

> The combined effects of the above experiences resulted in the
> emergence of a personality structure in which Mr. Morris felt unable or
> incompetent in making decisions about his life.  Overwhelmed by the
> complexity of life situations his psychological structure was steadily
> eroded to the point he desperately needed others to advise him
> regarding what to do with his life.  This pattern of pervasive and
> excessive need to be taken care of leads to submissive interpersonal
> behavior.

*Id.*

Although Joe is of average intelligence, his "cognitive thought process was limited and best described as 'concrete' in that he does not have a sophisticated understanding of the motives of individuals, complex situations and social/interpersonal interactions." *Id.* at 29. People with similar concrete thought patterns "are frequently described as naïve or gullible." *Id.*

Thus, when Hari enlisted Joe to take part in his misguided campaign, as Hari well knew, Joe struggled with auditory delusions. Hari had told Joe to listen to the angels who were speaking to him. He knew that after years of childhood trauma and abandonment to the Amish because he was bad, Joe felt unloved and unworthy. He had no self-esteem. Hari knew Joe was easily influenced by others and "desperately needed others to advise him about what to do with his life." *Id.* at 26. And he knew that Joe was naïve and gullible, with limited ability to engage in sophisticated reasoning.

Hari exploited Joe's vulnerabilities for his own evil purposes. Joe's mental illness contributed significantly to his offense conduct but it did not cause him to commit these crimes. It was Hari who did that. Joe's mental illness made him vulnerable to being exploited and manipulated by Hari. As Dr. Boswell explains:

> Individuals with a concrete cognitive pattern are frequently described as naïve or gullible. The current examiner opines that Mr. Morris understanding of the situation and his involvement in the sequence of events and behaviors associated with the current charges was significantly affected by information provided by Mr. Hari. Mr. Morris concrete style of thought and trust in Mr. Hari facilitated his belief that his actions were sanctioned by agents of the government. . . . Mr. Morris completely trusted Mr. Hari's explanation that their actions were part of a sanctioned government operation. The examiner opines

Mr. Morris was taken advantage of and manipulated into believing his actions were sanctioned and justified.

*Id.* at 29-30.

Hari was not just a random person on the street to Joe. He was a father figure. Hari's undue influence is a second ground for a significant downward variance.

## II. Hari's Manipulation and Exploitation of Joe Morris Is a Mitigating Circumstance Warranting a Significant Downward Variance

Without in any way minimizing the harm suffered by the congregants of the Dar al-Farooq Islamic Center, whose peaceful worship was shattered by Hari's bomb, and the other victims of the White Rabbit reign of terror, Joe Morris is also a victim of Emily Hari. As Joe is the first to admit, he never should have agreed to take part in Hari's heinous scheme. His decision to do so, however, was not surprising.

As Joe testified, Hari was like a father to him. Tr I:35. No one in the world was closer to him. *Id.* When Hari told Joe to do something, Joe did it. Tr. I:59. Hari was a hero to Joe. He felt that Hari accepted him. Tr I: 18-19. As Joe explained, Hari "thought that I was a good person that knew what he was doing, and it felt like I could be myself around him." *Id.* at 19. Given the despair of self-loathing in which Joe was mired for most of his life, one can only imagine how refreshing it was to be accepted by Emily Hari.

Hari offered Joe a way to give his life meaning. Joe understood that he was engaging in something important, something that Hari, Steve Bannon, and Congo Joe wanted done. Joe was not acting to advance his own political agenda. He had no

18

political agenda. He knew nothing about the Dar al-Farooq Mosque or its congregation. He had no idea who George Soros was or why anti-fascists were bad. He could repeat the toxic slogans with which Hari filled his head, but he had no real idea what they meant.

Indeed, these crimes were anathema to everything Joe Morris was raised to believe. The para-Amish community which raised him preaches pacifism and nonviolence. "Clearly, Mr. Morris's criminal conduct goes against the religious and moral teachings he received at Caneyville Christian Community and Mr. Morris's stated religious and moral beliefs." Butler Report at 27. Glenn Morris noted that Joe has never expressed a racist ideology. *Id.* The disconnect between Joe's actions and his own beliefs reflects the powerful sway Hari commanded in his life. Joe was willing to do what Hari asked him to do. Joe trusted Hari. He believed in her. And he believed Hari when she told Joe they were acting at the behest of Steve Bannon and the CIA.

Hari's influence over Joe was magnified because as discussed above, Joe was particularly susceptible to being influenced by others. As Dr. Boswell notes, "Mr. Morris displays a chronic pattern of passivity and need to be taken care of by other significant others in his immediate environment, first his grandparents, then the Amish and finally Mr. Hari." Boswell Report at 30-31. In Dr. Boswell's opinion, "Mr. Morris significantly relied on Mr. Hari as a father figure, friend and mentor.  Mr. Morris relied on Mr. Hari for advice regarding how to assess and respond to various

situations." *Id.* at 31. Moreover, his cognitive defects and intellectual deficits caused Joe to believe Hari without question.

Although Joe's actions are anathema to the para-Amish community which raised him, they continue to embrace him. They can see that the young man who committed these egregious acts is not the Joe Morris they raised. The person who committed these acts was created by Emily Hari. The Caneyville community could see how susceptible Joe was to the influence of others, Hari in particular.

Luke Geiser, who grew up with Joe in Caneyville, describes Joe as "extremely impressionable" who "very much wanted to please the people he was around." PSR ¶ 149. When Joe left the para-Amish community at age 18, the Geiser family was concerned about his future. Joe was "so influenced by the people he was with," Mr. Geiser said, "If he got into a wrong group, he was going to do whatever they said or did. We were not surprised to hear he got into trouble. We were surprised to hear that Mike [Hari] was the one to get him into trouble." *Id.* at 150. Hari was Joe's hero, Mr. Geiser said, but Hari let Joe down. *Id.*

Hannah Eby, who raised Joe in Caneyville, writes that Joe "never really developed a mature way of accepting cause and effect or objectively rationalizing situations." This "made him extremely vulnerable and influenceable," she said. Butler Report at 29-30.

Hannah's husband, Jonathan Eby, agrees, adding that Joe struggled "to grasp the concept of cause and effect or the consequences of his own actions." "Joe seemingly lacked the capacity to grasp the realities of the world." *Id.* at 31. Mr. Eby

concludes that "Due to the Hero role Mike played in Joe's life, it gave Mike the unique influence for leverage to get Joe to participate in the illegal activities Joe is now facing consequences for." *Id.*

Bryce Geiser, the Bishop in the community, is even more practical about Joe: "I do not think that he would ever have the brains or the drive to be a terrorist, except as a follower." *Id.* at 32.

Elijah Hess lived with Joe and Hari in Mexico. He described Joe as "such a follower," who was loyal to Hari. *Id.* at 34.

These letters, and others, have been submitted to the Court as Def. Ex. 5. They are summarized and excerpted in Ms. Butler's report at 28-39. It is notable how many people from the para-Amish community have written to the Court in support of Joe and who ask the Court to return Joe to their community.

In 2017, Joe did not have the intellectual or emotional tools to refuse to assist Hari. Joe was 22 years old with no criminal record. He understood that Hari was asking him to take part in important work which the government endorsed but could not do itself. Joe did not know what he would be asked to do until he was an hour away from the mosque. Even then, he understood and believed he was striking a blow against ISIS recruitment. Hari was not simply a father figure to Joe; she was a hero. No one was closer to Joe than Hari. And Joe was unusually susceptible to being influenced by others, as a result of his intellectual and cognitive impairments. Joe was an untreated schizophrenic, and he believed what Hari told him.

In a world where he rarely found it, Hari offered Joe acceptance. What a balm that must have been to Joe's abysmally low self-esteem. Suddenly, Joe's life had meaning and importance. He was a member of a group—the White Rabbits. The importance of his work was underscored by his uniform, his tactical vest, his patches, his rifle. They told Joe that finally, he belonged.

The government also recognizes the power Hari had over Joe. At Hari's sentencing the government spoke of the way Hari "preyed on those who were younger and less sophisticated, indoctrinating them with his poisonous beliefs. We saw this very clearly through the testimony, especially of Joe Morris." Hari Sent. Tr. at 180. *See also* R. Doc. 462 (Gov't Sent. Memo for Hari) at 15 n. 6 ("The Defendant used this 'fatherly' sway over Morris to convince him to stop taking prescribed psychiatric medications and to indoctrinate him with white supremacist and other extremist ideologies").

Joe Morris made a grievous mistake. But he is not a sociopath. He is not Emily Hari. He is a victim of Hari's hateful campaign. As Dr. Boswell concluded:

> Mr. Hari intentionally, maliciously and without regard for the consequences, used Mr. Morris to foster his own twisted sense of power and retribution against others he viewed as inferior. Mr. Morris was a small pawn in the larger game of Mr. Hari's hatred and vengeance against those he disliked.

Addendum at 11. Joe's mental illness and relationship with Hari made it impossible for him to appreciate the gravity of his actions or to say no. Again, Dr. Boswell:

> [Although] Mr. Morris was competent at the time he engaged in the unlawful behavior, his ability to fully understand the complexity of the

situation, and his role in the plan were compr[om]ised due to mental illness and unwavering loyalty to Mr. Hari.

*Id.* at 12.

Dr. Boswell has proposed detailed treatment recommendations for Joe. With antipsychotic medication and treatment, he is not a danger to the community. Yes, he should pay a severe price for his crime. But the significant mitigating circumstances call for a sentence substantially below what the sentencing guidelines recommend. For the reasons discussed in part IV below, a sentence of 120 months, is sufficient but not greater than necessary to achieve the purposes of sentencing.

### III. Mr. Morris's Cooperation Warrants a Substantial Downward Departure

As the Court is aware, Joe agreed to cooperate against Hari and testified at his trial. The Court was able to see Joe's testimony for itself. The government will give the Court an assessment of the value of Joe's cooperation.

Several factors make Joe's cooperation particularly significant. First, Hari was not simply Joe's co-conspirator. He was both a father-figure and hero to Joe. Joe's willingness to testify, therefore, must have been particularly difficult for him.

He made that decision not simply in the hope of receiving a lower sentence. Joe saw his cooperation as a way to make amends for his offense conduct. It is a reflection, therefore, of his acceptance of responsibility.

It is also significant that Joe made the decision to cooperate almost immediately following his arrest. He had not yet been indicted and had not yet received discovery. He did not know what the charges would be, or how his

cooperation would benefit him. Nonetheless, he immediately committed himself to making amends for his offense conduct however he could.

A substantial downward departure is warranted under U.S.S.G. § 5K1.1 and 18 U.S.C. § 3553(e).

## IV.   A Sentence Reduction Is Warranted to Reflect "Hard Time"

Joe Morris has been in custody at the Macon, Illinois and Sherburne County Jails since March 13, 2018, a period of over *four years*. He moved to Sherburne at the end of 2018. Granted, much of that time was spent waiting for Ms. Hari's cases to conclude in this district and the Central District of Illinois. Hari's trial was postponed on multiple occasions, and she only recently agreed to plead guilty to the charges pending against her in Illinois, influenced in part, no doubt, by Joe's continued willingness to testify against her. Thus, had Joe not agreed to cooperate, his case may have concluded earlier. Even so, the fact remains that Joe Morris has spent four years in a county jail, in conditions significantly worse than if he had been in the custody of the Bureau of Prisons.

As the Court knows, county jails are designed for short-term stays pending trial, not for years-long imprisonment. As a result, none of the resources or facilities that would be available to Mr. Morris in the Bureau of Prisons exist at the Sherburne County Jail. There are no classes available to him and limited legal materials. Although Mr. Morris appreciates that he is receiving medication to hold his delusions at bay, he is not receiving psychological therapy or counseling. In addition, as Dr. Boswell notes, when Mr. Morris first arrived at Sherburne in 2019,

he was misdiagnosed with adjustment disorder, a diagnosis Dr. Boswell was "at a loss to explain." Addendum at 11.

During the pandemic, Mr. Morris has been confined to his unit 24 hours a day. There have been several lockdowns during Covid outbreaks. These lasted several weeks at a time. During lockdowns, inmates were confined to their cells for all but one hour a day. In addition, whenever Mr. Morris had to go to court, he was kept in segregation for the next two weeks. In the period before and during Hari's trial, Mr. Morris spent two months in segregation.

Only recently have inmates at Sherburne been given access to the gym. For two years, therefore, Mr. Morris had no opportunity for exercise or recreation. Now, he is permitted to go to the gym for one hour a day, three days a week.

There is no opportunity to go outside at the jail. There is no prison yard. Even the windows are fogged so the inmates cannot see beyond the cinderblock walls. So, except when he was brought to court, for four years, Joe has had no opportunity to see the blue sky or breathe fresh air. In addition, the lights are left on 24 hours a day, so the inmates live in constant, garish, artificial daylight.

This Court has repeatedly recognized that a downward variance is appropriate to reflect the draconian conditions one faces from prolonged incarceration in a county jail. *See, e.g., United States v. Swarn,* 20-CR-141 (DWF/TNL) (Sept. 23, 2021) (granting 7-month hard-time credit for year spent at Sherburne County Jail); *United States v. Pawinee Unpradit*, 17-CR-107(4) (DWF/TNL), Sent. Tr. (Oct. 15, 2019) at 29 (granting 4 month "hard time credit");

*United States v. Lendale Thomas*, 07-CR-297(9) (DWF/JSM), Doc. No. 751 at 3 (sentence included 7-month downward variance "to account for Defendant's pretrial custody in the Sherburne County Jail"); *United States v Edmonds*, 920 F.3d 1212, 1214 (8th Cir. 2019) (noting this Court granted three-month "hard time" credit for time spent in county jail). *See also United States v. Fiorito*, 07-CR-212(1) (PJS/JSM) Doc. 418 at 74 (noting "that the conditions at the jail are harsher than the conditions at a typical federal prison" and agreeing to "give weight to this fact when deciding on Fiorito's sentence").

Joe's four years in county jail custody far surpasses the pretrial detention in all of the cases cited above.

## V.     The 3553 Factors Support a Significant Downward Variance

Given the unusual circumstances of this case the sentencing factors under Section 3553(a) support a significant downward variance. A review of those factors supports a sentence of 120 months as "a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing outlined in that statute.

1.     The Nature and Circumstances of the Offense, Including Mr. Morris's Belief He Was Acting at the Behest of the Government, Support a Reduced Sentence

Mr. Morris's offense conduct could not have been more egregious. His conduct risked the lives of whomever may have been near the bomb thrown in the Dar al-Farooq mosque and struck fear in the heart of the Muslim community. His other offenses were similarly abhorrent.

But Mr. Morris acted out of an abiding loyalty to Hari who he viewed as a father figure and a hero. And he acted under the false belief that his actions had been endorsed by the United States government. Joe Morris was manipulated and exploited by Hari. While that may offer little solace to the victims of the crimes, it significantly reduces Joe's culpability.

These unusual facts distinguish this case from the typical case and are not reflected in the guideline range.  As a result, the guidelines result in a sentence greater than necessary given the circumstances of this case.

2. The Guidelines Fail to Reflect Mr. Morris's Personal History and Characteristics, Including His Childhood Abuse and Neglect, and History of Mental Illness

The guidelines similarly fail to reflect the childhood trauma Joe Morris suffered at the hands of his biological parents, the controlling and authoritarian regime of Glenn and Pearl Morris, who were ill-equipped to care for young children, especially ones with special needs, and the persistent mental illness with which Joe has struggled since the age of 8. Joe's adoptive parents outsourced all parenting decisions to Emily Hari, who in turn, was like a father to Joe. Joe was particularly susceptible to Hari's influence as a result of his mental illness, which made him gullible, easily persuadable, and unable to make a decision for himself. This toxic stew created the perfect conditions that allowed Hari to suck Joe into his abhorrent scheme. As Dr. Boswell comments, Joe's crimes can only be understood as "in part, the product of long-term interaction with Michael Hari and serious and persistent mental illness." Addendum at 11.

The applicable guidelines and mandatory minimums do not contemplate someone who suffers from a mental illness that makes him particularly susceptible to be influenced by a Svengali figure feeding him a pack of lies. A downward variance is warranted.

3. A Ten-Year Sentence Properly Reflects the Seriousness of the Offense, Provides Just Punishment, and Promotes Respect for the Law

It does not unduly minimize the seriousness of the instant offense to recognize that Joe Morris is not the defendant that Congress and the Sentencing Commission had in mind when they created the penalties applicable to this case. The seriousness of an offense is determined by considering the harm inflicted by the crime combined with the culpability of the defendant. Joe Morris is significantly less culpable than the typical offender.

Even with the many mitigating circumstances presented by Joe's case, a ten-year sentence is a significant period of incarceration. No one will mistakenly believe the Court does not take these crimes seriously if it imposes a sentence that properly reflects Joe's unique vulnerabilities.

Moreover, respect for the law is not promoted by simply ramping up sentences so that the public can see that justice is harsh. Rigid adherence to mathematical guideline certainty without regard for the specific facts and circumstances of the case *discourages* respect for the law. A sentence that reflects the unique mitigating circumstances of an offense and the tragic life of the defendant promotes respect for the law. The Supreme Court in *Gall* cited approvingly the district court's rationale for sentencing Gall to a probationary term

for a serious drug offense, that "a sentence of imprisonment may work to promote

not respect, but derision, of the law if the law is viewed as merely a means to

dispense harsh punishment without taking into account the real conduct and

circumstances involved in sentencing." *Gall v. United States*, 128 S.Ct. 586, 599

(2007).

    4.  A Ten-Year Sentence Will Afford Adequate Deterrence

    Research has consistently shown that while the certainty of being caught and

punished has a deterrent effect, "increases in severity of punishments do not yield

significant (if any) marginal deterrent effects." Michael Tonry, Purposes and

Functions of Sentencing, 34 Crime & Just. 1, 28 (2006). "Three National Academy of

Science panels . . . reached that conclusion, as has every major survey of the

evidence." *Id.*; *see also* Zvi D. Gabbay, Exploring the Limits of the Restorative

Justice Paradigm: Restorative Justice and White Collar Crime, 8 Cardozo J.

Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known

to be a far better deterrent than its severity.").  Research regarding white collar

offenders in particular (presumably the most rational of potential offenders) found

no difference in the deterrent effect between probation and imprisonment. See

David Weisburd et al., Specific Deterrence in a Sample of Offenders Convicted of

White Collar Crimes, 33 Criminology 587 (1995); see also Gabbay, *supra*, at 448-49

("[T]here is no decisive evidence to support the conclusion that harsh sentences

actually have a general and specific deterrent effect on potential white-collar

offenders.").

These results are not surprising.  Potential criminals are not generally aware of the penalties for their prospective crimes, do not believe they will be apprehended and convicted, and simply do not consider sentence consequences in the manner one might expect of rational decision makers.

Ten years is a significant period of time. The loss of one's freedom for a decade is not something anyone would voluntarily accept. There is no reason to believe that a twenty-year sentence will have a greater deterrent effect than a ten-year sentence. If criminal sentences have any deterrent effect at all, a ten-year sentence will sufficiently deter future crimes of this nature, while also recognizing the unique circumstance of this case.

5.   A Sentence of Imprisonment for a Decade is Sufficient to Protect the Public from Further Crimes of the Defendant

Mr. Morris had no criminal record when he was set upon by Hari. He has 0 criminal history points. The Sentencing Commission's own data reflects that first offenders have a recidivism rate of only 3.5%, half the rate for offenders with one criminal history point.  U.S.S.G., Measuring Recidivism (May 2004).  Mr. Morris's crimes say more about Hari and the sway he had over Joe than they do about Joe.

When he is released from custody, Joe will need mental health treatment and a supportive environment. The Caneyville community has offered that environment. A treatment program along the lines recommended by Dr. Boswell will better protect the public than a prison sentence of more than a decade.

6.   A Sentence Well Grounded in the Unique Facts of this Case Does Not
     Create Unwarranted Sentencing Disparity

Unwarranted sentencing disparity can be caused either by treating like cases

differently or by treating different cases alike.  The foregoing discussion makes

clear that this case is not typical.  To lump Joe Morris into the same guideline range

as other offenders, like Hari, without regard to the facts that—he was suffering

from an untreated serious mental illness at the time of the crimes; he was

manipulated by Hari, who he viewed as a father figure and trusted completely; he

believed he was taking part in a mission which, even though illegal, had been

endorsed by the CIA; his mental illness made him particularly susceptible to Hari's

influence and made him unable to appreciate the full gravity of what he was doing;

he is in need of ongoing mental health treatment; and his risk of recidivism is

miniscule—would not reduce disparity.  It would simply ignore reality.  None of

these factors is considered by the sentencing guidelines.  A downward variance from

the guidelines to reflect these factors does not cause *unwarranted* sentencing

disparity. Rather, such a sentence would be tailored to fit both the offender and the

crime, incorporating the § 3553(a) factors as that statute requires.  In the face of the

unique circumstances of this case, rigid adherence to the sentencing guidelines does

not promote uniformity or comply with the mandate of §3553(a).

## Conclusion

Joe Morris would not be here were it not for Hari's manipulation. In the last

four years, Joe has done everything he can to make amends. He deeply regrets his

involvement in these crimes, which Hari falsely led him to believe had been

31

endorsed by the government. His crimes warrant a significant prison sentence, but one far below that recommended by the sentencing guidelines. The public will be better protected by giving Joe the opportunity for mental health treatment than decades of imprisonment. We ask the Court to sentence Mr. Morris to ten years in prison.

Dated:          March 23, 2022

                                        Respectfully submitted,

                                        *s/ Robert D. Richman*
                                        ROBERT D. RICHMAN
                                        Attorney ID No. 226142
                                        P.O. Box 16643
                                        St. Louis Park, MN  55416
                                        (651) 278-4987

                                        Attorney for Joe Morris