UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
District Court File Numbers 18-150 (DWF/HB) and 18-291 (DWF/HB) (D. Minn.)
District Court File No. 18-cr-20014 (C.D. Illinois)

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | **GOVERNMENT'S** |
| Plaintiff, ) | **SENTENCING POSITION** |
| ) | |
| v. ) | |
| ) | |
| JOE MORRIS, ) | |
| ) | |
| Defendant. ) | |

The United States of America, through its attorneys, Charles J. Kovats, Jr., Acting United States Attorney for the District of Minnesota and Assistant United States Attorneys Allison K. Ethen and Timothy C. Rank, submits the government's position on sentencing. Based on the facts adduced at trial, and the defendant's cooperation during the investigation of the case and the trial of his codefendant, the government respectfully requests that the Court apply a downward departure as to Minnesota Counts 2 and 4, pursuant to United States Sentencing Guidelines § 5K1.1 and 18 United States Code § 3553(e).

## FACTUAL BACKGROUND

From approximately August 2017 until March 13, 2018, codefendants Michael Hari (now known as Emily Hari), Joe Morris, and Michael McWhorter committed a string of terroristic crimes that targeted perceived "enemies" of the white supremacist militia group, the White Rabbits. The crimes were wide ranging and included things like bombing the Dar al-Farooq Islamic Center in Bloomington, Minnesota, robbing Walmart stores,

1

attempting to extort the Canadian National Railroad, conducting home invasions, and attempting to burn down the Women's Health Practice in Champaign, Illinois.

In March 2018, Hari, Morris, and McWhorter were arrested in Illinois and indicted in the Central District of Illinois on four felony counts including (1) Unlawful Possession of a Machine Gun, (2) Conspiracy to Interfere with Commerce by Threats and Violence, (3) Attempted Arson, and (4) Felon in Possession of a Firearm (Hari only).[1] All three codefendants were subsequently indicted in the District of Minnesota on five additional felony counts including (1) Intentionally Defacing, Damaging, and Destroying Religions Property Because of its Religious Character, (2) Intentionally Obstructing by Force the Free Exercise of Religious Beliefs, (3) Conspiracy to Commit Federal Felonies by Means of Fire and Explosives, (4) Using a Destructive Device in Relation to Crimes of Violence, and (5) Possession of an Unregistered Destructive Device (Hari only).  18-CR-150 (DWF/HB), Dkt. 14.

*The Bombing of Dar al-Farooq Islamic Center*

In the early morning hours of August 5, 2017, co-defendants Hari, Morris, and McWhorter bombed the Dar al-Farooq Islamic Center located in Bloomington, Minnesota. Each codefendant played a role in the attack.  Hari, the mastermind, rented the truck, provided the bomb, and drove the group from central Illinois through the night to

---

[1] The Central District of Illinois case number is 18-CR-20014 (MMM/EIL).  Joe Morris's case was transferred to the District of Minnesota under case number 18-CR-291 (DWF/HB) and the Illinois Indictment was filed at Docket 2 on November 19, 2018. Michael McWhorter's case was also transferred to the District of Minnesota under case number 18-CR-313 (DWF/HB) and the Illinois Indictment was filed at Docket 2 on December 14, 2018.

Bloomington, Minnesota. Upon arrival at the mosque, Morris and McWhorter exited the truck. Morris selected a window, smashing it with a sledgehammer, while McWhorter lit the fuse of a 20-pound black powder PVC pipe bomb and threw it, along with a can of diesel fuel, through the broken window. Hari drove them quickly away from the scene, while congratulating Morris and McWhorter on a job well done.

The resulting explosion destroyed the Imam's office. It knocked out ceiling tiles and light fixtures. It rapidly burned the blinds and carpet. It propelled jagged shards of shrapnel throughout the office, ripping into and destroying furniture. The blast was so powerful that it blew debris through a broken window more than 140 feet into the surrounding parking lot. It triggered the fire suppression system, which caused flooding and massive amounts of water damage. However, the physical damage to the building was collateral to the true harm caused by this terroristic act. The Dar al-Farooq community was terrified. Many members began attending other mosques, and for those who remained, the fear of another attack stayed in their minds as they attempted to pray. Parents, terrified for the safety of their children, no longer sent them to dugsi (religious education classes) at the mosque. Children attending the school adjoining the mosque walked past the broken window and crime scene tape, prompting questions about what had happened that parents and teachers could not – and should not need to – explain.

The bombing and the fire changed the atmosphere at Dar al-Farooq. What once was a welcoming and open place where families gathered and new Muslims were welcomed to the Minnesota community became a closed off and fearful place. The mosque was forced to hire an armed security guard stationed at the front doors, install exterior surveillance

cameras, and require those who entered to be admitted through locked doors. All of this is antithetical to the tenets of Islam, where mosques are traditionally open at all times to allow unrestricted access for prayer. Visitors can no longer freely access the physical prayer space, and the entire community has been made wary and suspicious of everyone they do not recognize. Because of the reduced number of people attending the mosque and community center, and the substantial costs of the new security measures, Dar al-Farooq struggled financially. With a single attack, the co-defendants irrevocably destroyed the sense of safety and peace that a house of worship is supposed to provide.

*Formation of the White Rabbits*

Within days of the bombing at Dar al-Farooq, Hari, Morris, and McWhorter began referring to their group as the "White Rabbits." They stayed at McWhorter's home, to evade law enforcement detection, and posed for a trophy photo, standing together in black balaclavas, wielding two semi-automatic rifles and the sledgehammer that Morris had used to break the mosque's window.

As the organization recruited new members, Hari formalized the White Rabbits' structure by assigning ranks to its members,[2] and providing weapons, body armor, helmets, and patches, depicting a white rabbit and the slogan "Ain't no fun when the rabbit got the gun." Some members, such as Hari and Morris, donned additional anti-Muslim insignia including patches reading "Infidel" and "Pork Eating Crusader."

---

[2] Hari named himself as Captain and made Morris a Corporal and McWhorter a Sergeant. According to both Morris and McWhorter, Sergeant was above Corporal.

*Creation of Fully Automatic Firearms (Machineguns)*

The White Rabbits were outfitted with firearms, specifically including four shotguns and four assault rifles which were later recovered during an FBI search of Michael McWhorter's brother's home. As discussed by expert witness Derrick McClarin at trial, two of the assault rifles were specially modified to fire as fully automatic weapons. The modification included manually drilling a hole into the rifles' lower receiver. In approximately October 2017, Hari, Morris, and McWhorter drilled out the lower receivers to convert the guns to fire automatically. Hari, Morris, McWhorter and a fourth co-defendant Ellis Mack, then fired the fully automatic firearms near the town of Paxton, Illinois.

*The Attempted Arson of the Women's Health Practice*

On November 7, 2017, the White Rabbits committed their second hate crime. This time the victim was a medical clinic in Champaign, Illinois, which was targeted because it offered abortions as one of its services. Like the bombing of Dar al-Farooq, Hari rented a truck and drove the group to Champaign. Upon arrival, Morris exited the truck with a sledgehammer and a PVC device that contained thermite, a powerful incendiary powder. Morris broke the clinic window and placed the thermite device on the windowsill, and returned to the vehicle, where Hari, McWhorter, and a third White Rabbit, Wesley Johnson, were waiting for him.

The thermite device failed to ignite. It was found, intact, the next morning by clinic staff who in turn called police and a bomb squad. While the White Rabbits did not burn down the clinic, their mission succeeded in terrorizing staff and patients at the clinic. The

5

Women's Health Practice no longer offers abortions as a service to its patients. The White Rabbits once again remained undetected by law enforcement.

*Walmart Robberies, Ambia Home Invasion, and Extortion of Canadian Railway*

On December 4, 2017, Hari, Morris, and McWhorter drove to a Walmart store in Watseka, Illinois. The White Rabbits specifically targeted Walmart stores because, according to Hari, the corporation supported left leaning political groups such as "Antifa." Morris went inside of the store, wearing a mask, and displaying a plastic airsoft gun. He demanded money from the cashier and received approximately $1,000. He then returned to the waiting car.

On December 16, 2017, Hari, Morris, McWhorter, and Wesley Johnson, drove to Ambia, Indiana, where they posed as law enforcement officers and pretended to execute a search warrant at a home belonging to the victim family. The White Rabbits targeted this family because they believed them to be illegal immigrants and drug dealers. Hari, Morris, and McWhorter forcibly entered the residence, brandishing firearms. The group zip tied the family members and spent approximately 30 minutes rummaging through their home before leaving empty-handed, finding neither drugs nor cash.

The next day, December 17, 2017, the White Rabbits attempted a second robbery of a Walmart store, this time located in Mt. Vernon, Illinois. Three men, including Morris, entered the Walmart and attempted to rob the cashier while Hari, McWhorter, and others waited outside. However, the cashier alerted other employees to the situation and the group fled without obtaining any money.

6

On January 17, 2018, Hari, Morris, and McWhorter drove to Effingham, Illinois. The group searched for railroad tracks belonging to the Canadian National Railway, and upon finding a set of tracks, McWhorter placed jumper cables on the rails and Hari secured a thermite device on the tracks with tape. Once the device was ignited, the group drove away from the area. Hari told McWhorter that he sent an email demanding Monero, a form of crypto currency, from Canadian National Railway in order to prevent future attacks. Canadian National received an email demanding Monero and threatening damage to Canadian National rail lines by means of fire and explosives, specifically mentioning thermite. Canadian National did not respond to the email threat.

*Fake Bomb Scare, Movement of Firearms, and Flight*

On January 18, 2018, Hari, Morris, and McWhorter attempted to frame an individual named J.O. by planting explosive material on J.O.'s property in Clarence, Illinois. Hari, Morris, and McWhorter prepared the bombs to place on J.O.'s property. Hari and Morris then snuck the items into a shed and submitted an anonymous tip to law enforcement claiming that J.O. had explosive materials at his residence.

This fake bomb scare created an intense law enforcement presence focused on Clarence, Illinois. Based on the influx of officers in the town, Hari and McWhorter moved four shotguns and four assault rifles, including the two which had been modified to be fully automatic weapons, from the White Rabbit's office headquarters to Michael McWhorter's brother's home in Clarence, Illinois, to hide them from police.

On February 27, 2018, the FBI located the firearms at McWhorter's brother's home. Upon learning that law enforcement confiscated the weapons, Hari, Morris, McWhorter,

7

and Ellis Mack fled from authorities and remained hidden in rural Illinois for approximately two weeks. The group returned to Clarence, Illinois, on March 10, and were arrested shortly thereafter on March 13, 2018. Hari, Morris, and McWhorter have been in custody since that time.

## ARGUMENT

### I. SENTENCING GUIDELINES

The government agrees that the Sentencing Guidelines calculations (PSR ¶¶ 67-124) and the statutory terms of imprisonment (PSR ¶ 173) contained in the Final Presentence Report are accurate.

As to Illinois Counts 1-3 and Minnesota Count 2, the PSR properly assigns a total offense level of 28. This includes a statutory mandatory minimum sentence of 5 years as to Minnesota Count 2. Based on the defendant's criminal history category of I, the total guideline range for Illinois Counts 1-3 and Minnesota Count 2 is 78-97 months imprisonment. (PSR ¶ 174).

As to Minnesota Count 4, 18 U.S.C. § 924(c)(2)(B)(ii) requires a mandatory minimum sentence of not less than 30 years. The statute further states that the mandatory minimum sentence shall be imposed consecutively to the punishment imposed on any other counts. 18 U.S.C. § 924(c)(1)(A). Therefore, the Defendant's total applicable Guideline range for Illinois Counts 1-3 and Minnesota Counts 2 and 4 is 438-457 months imprisonment with 420 months, or 35 years, being the statutory mandatory minimum.

## II. DOWARD DEPARTURES UNDER 18 U.S.C. § 3553(e) AND U.S.S.G. § 5K1.1.

Prior to sentencing, the government will move for a departure from the statutory mandatory sentences as to both Joe Morris and Michael McWhorter on Minnesota Counts 2 and 4 based on the co-defendant's substantial assistance and cooperation during the investigation and prosecution of co-conspirator Hari.

## III. VICTIM IMPACT AND STATUTORY SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A).

Leadership on behalf of Dar al-Farooq Islamic Center has expressed their desire to advocate for leniency on behalf of Joe Morris and Michael McWhorter and to specifically request a sentence focused on restorative justice rather than punitive punishments. Both Morris and McWhorter have expressed remorse for their participation in the bombing and have accepted responsibility for their actions. The government acknowledges and greatly respects Dar al-Farooq's ability to forgive their attackers and to use this act of terrorism as a platform to promote mercy. Considering the victims' position, the government has attempted to balance the wishes of the victims with (1) the statutory factors which must be weighed as part of these sentences, (2) the cooperation provided during the investigation and trial, and (3) the crimes committed in the Central District of Illinois.

There are several particularly relevant § 3553(a) factors that the government believes the Court should consider when fashioning an appropriate sentence for Morris, specifically: (1) the nature and circumstances of the offense, (2) the seriousness of the offense, (3) the defendant's history and characteristics, and (4) the need for deterrence.

### A. Nature and Circumstances of the Offenses and the Seriousness of the Offenses

Much of the focus of the White Rabbits' criminal behavior has centered on the bombing of Dar al-Farooq in August 2017. Clearly, the premeditated bombing of a house of worship is an extremely violent and serious offense. The nature and circumstances underlying Minnesota Counts 2 and 4, to which Morris pled guilty, are incredibly severe. However, it is equally important to focus on the other three counts to which Morris pled guilty stemming from his behavior in Illinois. This includes (1) the unlawful possession of a machinegun, (2) a conspiracy to interfere with commerce based on threats and violence, and (3) attempted arson. While these incidents were discussed less frequently during Hari's trial, they are also acutely serious and dangerous offenses.

It is true that neither Morris nor McWhorter were the leaders or masterminds behind the White Rabbits criminal operations. Hari clearly played those roles. Both Morris and McWhorter, however, participated in the events charged in Illinois Counts 1-3 to further the White Rabbit agenda. The essential objective of the White Rabbits was to suppress and terrify the group's perceived enemies, including Muslims, women, immigrants, Walmart, and the Canadian National Railway. Hari, Morris, and McWhorter worked to further these goals by manufacturing and arming themselves with fully automatic weapons, test firing those weapons, stealing or attempting to steal money to support their cause, and attempting to burn down a women's clinic.

These criminal actions were not fleeting missteps nor were they acts committed in the heat of passion. Both Morris and McWhorter participated in numerous criminal actions

over a period of approximately 7 months. Until the FBI investigation into the group became known in March 2018, neither man attempted to leave the group or to report to law enforcement what had happened. While some of these crimes were ultimately unsuccessful, they required forethought and planning to execute. The magnitude of the crimes committed by Hari, Morris, and McWhorter under the White Rabbit name were serious, dangerous, and their effects on the victims, both in Minnesota and Illinois, have been severe.

### B. Morris's History and Characteristics

As discussed at trial and in the presentence investigation, Joe Morris had a traumatizing and difficult childhood. After being removed from an abusive home, he was ultimately adopted by his maternal grandparents, who raised him in rural Illinois. When Morris had behavioral issues as a pre-teen, his grandparents, under the advice of Hari, sent Morris to live in an Amish farming community in Kentucky.

Perhaps most relevant to the crimes at issue is Morris's lifelong connection with Hari, both as a child and an adult. Morris and his grandparents described Hari as an authoritative figure, a person from whom Morris's grandparents regularly sought advice about how to raise Morris. The sway that Hari held over Morris's upbringing appears to be incredibly strong. For example, at trial, Morris testified that as a young person, he was diagnosed with schizophrenia and received medication to stop the "voices" in his head. Morris ultimately stopped taking the prescribed medications because Hari intervened and convinced Morris and his family that the medications were not a good idea.

11

Morris further testified that as a young person, he felt alone, isolated, and unaccepted by the people he interacted with, but with Hari, Morris stated he finally felt accepted. Hari never made Morris feel "less than." Likely due to the lack of stable and kind father figures in his life, Morris became close to Hari and admired him. While Morris's relationship to Hari does not provide an excuse for his crimes, it is valuable context for the reasoning behind Morris's actions and his willingness to commit violent actions merely because someone else told him to do so.

### C. Need for Deterrence

One of the government's foremost concerns in assessing the appropriate sentence in this case is the need for deterrence. While the government concedes it is unlikely that Morris or McWhorter will ever bomb another mosque or try to burn down another health clinic, it is imperative that the Court send a message of deterrence to the community at large. It is not an exaggeration to say that hate-motivated crimes have risen drastically in the United States in recent years. As this bar graph shows, the number of people murdered in attacks motivated by religious bias in 2018, the year following the Dar al-Farooq attack, was equal to the number killed in such attacks in the preceding seven years *combined*.



Figure 2. FBI Hate Crime Data: individuals killed due to religious affiliation

Figure 2 shows the number of individuals killed due to reasons of religious affiliation and bias as tracked by FBI Hate Crime statistics. This number is included as a subset of the total number of individuals victimized for religious affiliation reflected in figure 1.

Source: FBI UCR hate crime statistics, table 7, https://www.fbi.gov/services/cjis/ucr/hate-crime

Attacks on houses of worship are a serious problem in the United States, and the problem is getting worse. As the map below shows, mass shootings, bombings/arsons, and vehicle rammings directed at religious congregations have taken place from coast to coast.[3]

These include the attack on the Sikh Temple in Oak Creek, Wisconsin, which occurred five years to the day before the Dar al-Farooq bombing, on August 5, 2012, and resulted in six deaths. Other, even more horrible attacks followed, including the mass shooting at the Tree of Life synagogue in Pittsburgh, in which eleven victims were killed and six others, including four responding police officers, were injured. Similarly, in the Poway Synagogue mass shooting in southern California, one person was killed, and three others, including the synagogue's rabbi, were injured.

---

[3] Source: United States Department of Homeland Security



As to attacks on mosques specifically, even just in Minnesota, incidents include: An attack at a mosque in northeast Minneapolis in November 2019, in which a glass door was broken and the attacker shouted at a mosque member inside;[4] strips of bacon being deposited at the front door of a mosque in Rochester in June of 2018;[5] and a teenage girl entering the Da'wah mosque in St. Paul in July 2016, to find the mosque had been broken

---

[4] *Attack on Minneapolis Mosque Comes as Reports of Hate Crimes Drop,* Star Tribune, (Nov. 12, 2019), http://www.startribune.com/attack-on-minneapolis-mosque-comes-as-reports-of-hate-crimes-drop/564818952/?refresh=true.

[5] *Police Investigate After Bacon is Left at Rochester Mosque¸* MPR News (Jun. 25, 2018), https://www.mprnews.org/story/2018/06/25/police-investigate-bacon-left-at-rochester-mosque.

into and notes left reading "Muhammad was a rapist" and "F**k Islam."[6] The attack on the Dar al-Farooq mosque, in short, is a crime in which the need for a sentence that embodies general deterrence is critical to send the message that the justice system does not tolerate hate crimes directed at mosques, and that Muslims' right to safely practice their faith is protected in the same way all religious worship is protected in the United States.

## CONCLUSION

The Government respectfully requests that the Court sentence Joe Morris commensurately with the considerations contained in this Memorandum and the forthcoming departure motion which will be filed in advance of sentencing.

Dated:     March 22, 2022                                  Respectfully Submitted,

CHARLES J. KOVATS, JR.
Acting United States Attorney

/s Allison K. Ethen

BY: ALLISON K. ETHEN
TIMOTHY C. RANK
Assistant United States Attorneys

---

[6] *Hate Message Allegedly Left at St. Paul Mosque*, CBS Minnesota, (Jul. 26, 2016), http://minnesota.cbslocal.com/2016/07/26/st-paul-mosque-hate-speech.